**UNITED STATES of America, Appellee,**

v.

**Thaddeus Adonis LONG, Appellant.**

**UNITED STATES of America, Appellee,**

v.

**Edward Larry JACKSON, Appellant.**

**Nos. 87–5163, 87–5164.**

United States Court of Appeals,
Eighth Circuit.

Submitted Feb. 8, 1988.

Decided Sept. 9, 1988.

Scott Tilsen, Asst. Federal Public Defender, Minneapolis, Minn., for appellant Long.

Paul Engh, Minneapolis, Minn., for appellant Jackson.

John M. Lee, Asst. U.S. Atty., Minneapolis, Minn., for U.S.

Before HEANEY and BOWMAN Circuit Judges, and FAIRCHILD,* Senior Circuit Judge.

---

* The HONORABLE THOMAS E. FAIRCHILD, United States Senior Circuit Judge for the Seventh Circuit, sitting by designation.

HEANEY, Circuit Judge.

Thaddeus Adonis Long and Edward Larry Jackson appeal from their convictions on a number of counts for their involvement in a check forging and bank fraud scheme. We affirm their convictions on all counts.

On August 14, 1986, the United States issued a treasury check in the amount of $434,188.80, payable to Land O'Frost, an Illinois company. The check was sent to Land O'Frost but ended up in the hands of Long or Jackson. Jackson offered Dennis Mentzos $100.00 to assist him in cashing the check. Mentzos accepted.

Jackson obtained a rubber stamp with "Land O'Frost" and the signature of "James Frost" printed on it and an ID card in the name of John Turner of Thermo–Dynamics. Mentzos signed the name John D. Turner on the ID card. Mentzos and Jackson rented a telephone answering service listed under the name Thermo–Dynamics.

Using the name John D. Turner, Mentzos opened an account at Norwest Bank in downtown St. Paul and deposited $50.00. He supplied the bank with a telephone number of Thermo–Dynamics and a reference, the State Bank of St. Cloud. On the signature card, he signed the name John D. Turner. At Jackson's home in St. Paul, Jackson asked Mentzos to endorse the check with the name John D. Turner. Mentzos refused but agreed to sign a blank piece of paper. Jackson copied the signature on the back of the check and stamped the Land O'Frost endorsement on it. An acquaintance of Jackson deposited the treasury check, and the bank credited the Thermo–Dynamics account in the amount of the check.

Long flew to Minnesota from Chicago. He registered at a hotel as Mr. Kimball. On August 25, using the name Anthony Smith and posing as an executive of Thermo–Dynamics, Long bought a Porsche automobile from a dealer with a $28,000 Thermo–Dynamics check.

On August 26, Mentzos and Jackson picked up Long at his hotel. Jackson gave Long various forms of false identification in the name of Anthony Smith. They went to Norwest. Long signed the name Anthony Smith on the Thermo–Dynamics signature card and obtained a number of starter checks. Outside the bank, Mentzos signed, as John D. Turner, two of the checks. Mentzos was later paid $100 and a bonus of $400 for his help.

That same day, Long returned to Norwest and asked to cash a $16,000 check from Thermo–Dynamics payable to Irving Kimble.[1] Long was given the amount in cash.

On August 29, while at temporary offices which he had rented, Long asked the receptionist on duty to type the name Anthony Smith under the drawer signature line of a number of blank Norwest checks. Long asked that one of those checks be made payable to Norwest Bank of St. Paul in the amount of $56,685.

Norwest subsequently began an investigation of the Thermo–Dynamics account. It discovered that the telephone number supplied by Mentzos was for a residence and that the State Bank of St. Cloud did not exist. Long went into the bank to cash the check for $56,685. After he endorsed the check before a Norwest employee, the St. Paul police arrested him. An officer searched Long's belongings and found an Illinois driver's license, a Thermo–Dynamics identification card, and a Minnesota driver's license receipt, all in the name of Anthony Smith. The police apparently arrested Jackson soon thereafter.

Jackson was indicted on seven counts: four counts of defrauding a federally insured bank, 18 U.S.C. § 1344; one count of conspiring to forge and utter a treasury check, 18 U.S.C. § 371; and two counts of forging and uttering a treasury check, 18 U.S.C. § 510. Jackson was found guilty on all counts and sentenced to concurrent sentences of five years on the first four counts, to a consecutive sentence of five years on the fifth count, and to a consecutive sentence of five years on the sixth count. The sentence on the seventh count was suspended, and a five-year term of

---

1. In the record, the name is also spelled "Kimball".

probation, to begin after Jackson's release from prison, was imposed. Thus, Jackson's total sentence was fifteen years of imprisonment with five years of probation.

Long was indicted on five counts: four counts of defrauding a federally insured bank, 18 U.S.C. § 1344; and one count of conspiracy to defraud the United States by forging and uttering a check, 18 U.S.C. § 371. He was found guilty of all counts and was sentenced to four years for the first two counts and consecutive sentences of four years for the second two counts. The sentence on the fifth count was suspended and a term of probation, to begin after release from prison, was imposed. Thus, Long's total sentence was twelve years of imprisonment with five years of probation.

Long and Jackson claim a number of errors.

## A. Prior Convictions

■ In his testimony at trial, pursuant to a plea agreement, Mentzos explained the details of the criminal scheme. On direct examination by the government, he stated he had been convicted of two counts of fifth degree sexual assault in 1985. On cross-examination, Long's counsel asked Mentzos if he had also been convicted of third degree criminal sexual assault in 1985. He said "no." The government objected to the question. The trial judge sustained the objection and instructed the jury that "the fact of a question being asked did not imply a fact", i.e., that Mentzos was connected with the sexual assault. Counsel continued the cross-examination for about forty minutes and then requested a side bar conference.

At that conference, defense counsel pointed out that Mentzos' record of conviction, which the government had furnished the defense, stated that Mentzos had been convicted of two counts of third degree sexual assault. Mentzos explained that the record, provided by the government, was of his son (who had the same name). The mistake had been made because the birthdate was inverted to read "1946," rather than the son's correct birthdate of 1964. The defense moved for a mistrial.

The trial court denied the motion. It instructed the jury that the state court had made a record-keeping error, that the person on the stand had not committed the crime of third degree sexual assault, and that both parties had been confused by the mistake in the record.

Long claims that this mistake cost his counsel credibility before the jury. Furthermore, he asserts that the United States deliberately furnished the wrong record of conviction.

■ We believe the court correctly determined that the significance of the incident was reduced by the facts that the exchange concerning the conviction was brief, the side bar conference did not occur until about forty minutes after the incident, and the trial judge gave a curative instruction that the mistake was the fault of neither party. Moreover, the record does not indicate that the government intentionally attempted to mislead the defense. Although Long's counsel points out that the government asked every witness, except Mentzos, about every conviction of record, we do not believe this establishes the government intentionally misled defense counsel. We, therefore, hold the trial court did not abuse its discretion in denying the motion for a mistrial.

## B. Insufficiency of the Evidence

■ Jackson contends that the evidence was insufficient to support the jury verdict on all counts. Long contends the evidence was insufficient to support the jury verdict on the count of conspiring to forge and utter a treasury check. A verdict must be based on substantial evidence, and we must view the evidence in the light most favorable to the jury verdict. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942).

Jackson claims he should not have been found guilty of the four counts of aiding the bank fraud because he was merely a passive participant in the scheme. The four counts involved the opening of the Thermo–Dynamics account and the deposit-

ing of the $50, a check which was used as a deposit for the answering machine, the withdrawal of the $16,000 by Long (posing as Kimball), and the withdrawal of the $56,685 by Long. The pertinent section, 18 U.S.C. § 1344, prohibits one from knowingly executing or attempting to execute a scheme or artifice to defraud a federally insured bank.

Jackson argues he was associated with Mentzos and Long but did not actively participate in the scheme. The evidence, however, overwhelmingly shows that Jackson was deeply and knowingly involved in the scheme to defraud Norwest. He executed many "artifices" which aided the scheme. He gave Mentzos money for the initial deposit and drove him to the bank. He stamped the stolen check with the Land O'Frost insignia which he designed. He assisted in depositing the check. He supplied Long with false identification in the name of Anthony Smith. Finally, he accompanied Long to the bank when he withdrew the $16,000.

█ Jackson also claims that the evidence was insufficient to convict him of conspiring to forge and utter a treasury check. Again, contrary to his assertions, Jackson acted as more than a mere associate. *See United States v. Graham*, 548 F.2d 1302, 1312 (8th Cir.1977) ("[g]uilt cannot be inferred from the mere presence of a defendant at the scene of the crime or mere association with members of a criminal conspiracy"). His conduct was absolutely essential to the scheme, and the evidence shows Jackson entered the scheme knowing this.

█ Finally, as to the two counts of forging a government check and aiding in the uttering of that check with a forged endorsement, the evidence, while not overwhelming, was sufficient to convict Jackson. Jackson points out that Mentzos' testimony regarding Jackson's signing of the treasury check was "vague" and the handwriting analysis of an FBI handwriting expert was inconclusive. However, the question ultimately turned on Mentzos' credibility, a matter for the jury to weigh. We,

therefore, find the evidence sufficient to convict Jackson on all charged counts.

█ Long claims the evidence was insufficient to convict him of conspiracy to defraud the government by forging and uttering a treasury check. He contends that the forging of the check and the opening of the bank account and the depositing of the check occurred prior to his arrival in Minnesota. Thus, according to Long, the conspiracy was completed by the time he arrived.

We believe the jury could have reasonably inferred from the evidence that Long had participated in establishing the scheme, even though he was not present in Minnesota at the time the acts in question took place. Mentzos and Jackson took many actions in anticipation of Long's arrival. Long was the witting beneficiary of many of those actions. This evidence strongly suggests that Long participated in the conspiracy. We, therefore, find the evidence sufficient to convict Long of the conspiracy count.

### C. Contract

█ At trial, Long called his fiancee, Mary Statten, as a witness. On direct examination, she briefly mentioned a contract Long signed prior to coming to Minnesota, which, according to her, led her and Long to believe he was participating in a legitimate business venture. The government did not object to her mentioning the contract. On cross-examination, the government questioned her quite extensively about the contract. She replied that the contract involved Thermo–Dynamics and that Jackson had hired Long for six months for $40,000 as a promoter. She indicated that Long had probably brought the contract with him to Minnesota. On re-direct examination, Statten identified an exhibit as the contract of employment. The government and Jackson objected to the exhibit as hearsay. The trial court sustained the objection.

At a side bar conference, Long's counsel argued that the exhibit was not being offered for its truth but rather to show Long's state of mind, as the best evidence

of the agreement about which Statten testified on direct examination, or as a response to the government's cross-examination which implied that the contract was a recent fabrication. The trial court questioned whether the contract had been authenticated.

■ On appeal, the government only argues that the trial court did not abuse its discretion in excluding the contract because it had not been authenticated. To authenticate a document, the proponent need only prove a rational basis for the claim that the document is what the proponent asserts it to be. *See United States v. Natale,* 526 F.2d 1160, 1173 (2d Cir.1975), *cert. denied,* 425 U.S. 950, 96 S.Ct. 1724, 48 L.Ed.2d 193 (1976) (using Rule 901(a) as aid in case in which Federal Rules of Evidence had not yet become effective); *see also,* J. Weinstein and M. Berger, *Weinstein's Evidence,* ¶ 901(1)[02], at 901–21 (1983) (the standard of admissibility under Rule 901 "is identical to that required under Rule 104(b). ... [W]ould a finding of fulfillment of the condition be supported by the evidence?"). This may be done with circumstantial evidence. *See Natale,* 526 F.2d at 1173.

For the purpose of attempting to bolster Statten's testimony, we see no reason why the contract was insufficiently authenticated. The government contends that Statten was not a party or a signatory to the document or witness to its preparation. The question of authenticity here, however, is *not* whether the contract was an authentic *contract* between Jackson and Long but whether it reasonably could be the document which Statten claims she saw and read at the airport. The defense did not have to prove the contract's reliability and accuracy. This was a matter for the jury to determine after examining all the evidence. *See* J. Weinstein and M. Berger,

*Weinstein's Evidence,* ¶ 901(a)[02], at 901–22 (1983).[2] Thus, the document was authenticated as the document which Statten claims she saw and read.

■ Any error which occurred, however, was harmless. The contract was introduced to bolster Statten's testimony that Long thought he was entering a legitimate business enterprise. Other evidence strongly indicated that Long had not unwittingly entered the fraud scheme. Long used various aliases and false forms of identification; he did nothing that could be construed as a legitimate business activity while in Minnesota; and the cash he withdrew from the bank was for his personal use. We, therefore, find no reversible error.

### D. Ineffective Assistance of Counsel

■ Jackson contends his trial counsel was ineffective. To prevail on an ineffective assistance of counsel claim, a defendant must show that his or her attorney's performance "fell below an objective standard of reasonableness," *Strickland v. Washington,* 466 U.S. 668, 687–88, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984), and that, but for this ineffective assistance, there is a reasonable probability that the outcome of the trial would have been different. *Id.* at 694, 104 S.Ct. at 2068.

Jackson cites a number of instances of ineffectiveness. First, he claims his lawyer in effect conceded Jackson was guilty of the conspiracy in his opening statement:

> There will be several instructions at the end of the case about conspiracy and all these other things which I won't go into now, but the questions that you're going to have to answer are who was the one that committed this crime, and was he actively involved in the crime or was it just a peripheral involvement in the crime.

¶ 901(a)[01], at 901–19 (1983). We believe, however, such a problem should be confronted under Rule 403, which states that relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury...."

---

**2.** There is the danger that such documentary evidence may be given undue weight by a jury. As Weinstein and Berger observe, "[r]eal proof often has enormous apparent probative force because the lay trier may lose sight of the fact that its connection to a party may depend upon the credibility of an authenticating witness." J. Weinstein and M. Berger, *Weinstein's Evidence,*

Jackson argues that "peripheral involvement" may be all that is needed for the government to prove involvement in a conspiracy or aiding and abetting a crime.

■ We do not think the statement showed a concession of Jackson's guilt. A showing of peripheral involvement is not dispositive of guilt. One could be peripherally involved and yet be not guilty because he or she lacked the requisite intent to commit the crime. The evidence showed, at a minimum, that Jackson was involved in the crime. The defense lawyer recognized this and was merely arguing that this involvement was insufficient to satisfy the elements of each of the charges.

■ Second, Jackson asserts that certain evidence introduced against Long, namely Long's false identification cards and the record of an arrest of Long for speeding in Wisconsin, prejudiced Jackson. Jackson claims his counsel should have requested a cautionary instruction or a severance of the co-defendants' trial.

Jackson argues that a cautionary instruction would have been proper because the evidence admitted against Long was irrelevant and prejudicial to Jackson. As the government points out, however, most of the evidence admissible against Long was admissible against Jackson. The only evidence which may not have been admissible against Jackson was Long's record of arrest in Wisconsin. This piece of evidence did not prejudice Jackson significantly.

■ As to the failure to request a severance, we observe that Jackson's and Long's positions were at odds. This alone, however, did not make counsel's failure to request a severance unreasonable. Generally, defendants "charged in a conspiracy should be tried together, particularly where proof of the charges against the defendants is based upon the same evidence and acts." *United States v. Jackson*, 549 F.2d 517, 523 (8th Cir.) *cert. denied*, 430 U.S.

985, 97 S.Ct. 1682, 52 L.Ed.2d 379 (1977). To obtain a severance, a defendant must show clear prejudice. *Id.* Clear prejudice does not mean merely that a defendant's "chances for acquittal would have been better" with a separate trial. *Id.* at 524. She must demonstrate that a reasonable jury would have reached a different result in a separate trial, as opposed to a joint trial, because it could not be expected to consider separately the evidence against each defendant. *See United States v. Massa*, 740 F.2d 629, 644 (8th Cir.1984), *cert. denied*, 471 U.S. 1115, 105 S.Ct. 2357, 86 L.Ed.2d 258 (1985). Jackson has not shown such prejudice. Therefore, Long's attorney's failure to request a severance was not unreasonable.[3]

■ Finally, Jackson claims his attorney abandoned his role as Jackson's advocate and coerced Jackson not to testify. He allegedly did this by suggesting to the trial judge, out of the presence of the jury, that his client might perjure himself. This, according to Jackson, violated his sixth amendment right to effective assistance of counsel and his fifth amendment right to testify.

In *Nix v. Whiteside*, 475 U.S. 157, 106 S.Ct. 988, 89 L.Ed.2d 123 (1986), the Supreme Court addressed the troubling question of how an attorney should respond upon learning a client will commit perjury upon taking the stand. In that case, Emmanuel Whiteside was convicted of the murder of Calvin Love. At trial, Whiteside had claimed he stabbed Love in self-defense.

On collateral attack of that conviction, Whiteside alleged that his right to counsel and to testify had been violated because, although he took the stand, his attorney had coerced him not to testify that he had seen a gun in Love's hand before stabbing him. The trial court found that Whiteside would have perjured himself if he testified

---

**3.** Jackson argues that his counsel failed to object to hearsay statements by Long. Jackson concedes that these statements would be admissible upon proof of the conspiracy. He argues, however, that the proof of the conspiracy was tentative. As stated above, the evidence of a conspiracy between Jackson and Long was strong. Jackson also claims that his counsel acted unreasonably in failing to formulate a defense theory. We find this argument meritless.

that he had seen the gun. It held that, because Whiteside's rights to effective assistance of counsel and to testify did not include the right to testify falsely, those rights were not violated. This Court reversed. *Whiteside v. Scurr*, 744 F.2d 1323 (8th Cir.1984).

The Supreme Court overruled this Court. It held that when a defendant "announces" an intention to commit perjury, the defendant's rights to effective assistance of counsel and to testify are not violated if the attorney takes certain clear steps to prevent the presentation of that false testimony. Those steps include attempting to dissuade the client from testifying falsely, threatening to report the possibility of perjury to the trial court, and possibly testifying against the defendant should he be prosecuted for perjury. As the Court observed, neither right was violated, because the right to testify, assuming there is one,[4] does not "extend to testifying falsely," *id.* 475 U.S. at 173, 106 S.Ct. at 998, and because "the right to counsel includes no right to have a lawyer who will cooperate with planned perjury." *Id.* at 173, 106 S.Ct. at 998.

In the instant case, Jackson's lawyer asked to approach the bench after the government had presented its case. The lawyer told the trial judge that Jackson wanted to testify and that he was concerned about his testimony. The lawyer said he advised Jackson not to take the stand. The judge excused the jury and everyone else in the courtroom, except a United States Marshal, Jackson, and his lawyer. At that point, the lawyer said, "I'm not sure if it wouldn't be appropriate for me to move for a withdawal from this case based upon what I think may be elicited on the stand.... I'm concerned about the testimony that may come out and I'm concerned about my obligation to the Court." The trial judge informed Jackson he had a right under the law to testify on his own behalf, which Jackson said he understood. The court also informed Jackson

that his counsel was bound by his professional obligation not to place evidence before the court which he believed to be untrue. Jackson also said he understood this.

The judge stated that Jackson could take the stand and give a narrative statement without questioning from his lawyer. The judge noted that if Jackson's attorney found "things which he believes to be not true ... he may have other obligations at that point." The lawyer responded that he had again discussed the matter with Jackson and that Jackson had decided, on his own, not to testify. Upon questioning by the judge, Jackson again stated that he understood his right to testify and his attorney's obligations. Jackson thereupon informed the court that he did not wish to testify.

This case differs from *Whiteside* in three respects. Each difference raises important questions which can only be answered after an evidentiary hearing.

*First,* in *Whiteside,* a finding was made that Whiteside would have testified falsely had he given the testimony he initially wanted to give. *See Whiteside,* 475 U.S. at 162–63, 106 S.Ct. at 992–93. Such a finding has not been made here. In terms of a possible violation of Jackson's rights, this is crucial. If, for example, Jackson's lawyer had no basis for believing Jackson would testify falsely and Jackson, in fact, wanted to testify truthfully, a violation of his rights would occur.

We do not know what measures Jackson's attorney took to determine whether Jackson would lie on the stand. He was required to take such measures as would give him "a firm factual basis" for believing Jackson would testify falsely. As we stated in our opinion in *Whiteside v. Scurr,* 744 F.2d at 1323, *rev'd on other grounds, sub nom Nix v. Whiteside,* 475 U.S. at 157, 106 S.Ct. at 988:

> be doubted that a defendant in a criminal case has the right to take the witness stand and to testify in his or her own defense").

---

**4.** The Supreme Court has since recognized explicitly the constitutional right to testify. *See Rock v. Arkansas,* — U.S. ——, 107 S.Ct. 2704, 2708–09, 97 L.Ed.2d 37 (1987) (stating "it cannot

Counsel must act if, but only if, he or she has "a firm factual basis" for believing that the defendant intends to testify falsely or has testified falsely.... It will be a rare case in which this factual requirement is met. Counsel must remember that they are not triers of fact, but advocates. In most cases a client's credibility will be a question for the jury.

*Id.* at 1328 (citations omitted).

■ The Supreme Court's majority opinion in *Whiteside* emphasizes the necessity of such caution on the part of defense counsel in determining whether a client has or will commit perjury. In discussing the attorney's duty to report possible client perjury, the majority states that it extends to "a client's *announced plans* to engage in future criminal conduct." 475 U.S. at 174, 106 S.Ct. at 998. (emphasis added). Thus, a clear expression of intent to commit perjury is required before an attorney can reveal client confidences.

The concurring opinions in *Whiteside* support this interpretation. Justice Stevens advised circumspection: "A lawyer's certainty that a change in his client's recollection is a harbinger of intended perjury * * * should be tempered by the realization that, after reflection, the most honest witness may recall (or sincerely believe he recalls) details that he previously overlooked." *Id.* at 190–91, 106 S.Ct. at 1007. And, Justice Blackmun in his concurrence observed that "[e]xcept in the rarest of cases, attorneys who adopt 'the role of the judge or jury to determine the facts' ... pose a danger of depriving their clients of the zealous and loyal advocacy required by the Sixth Amendment." *Id.* at 189, 106 S.Ct. at 1006 (citation omitted).[5]

■ Justices Blackmun and Stevens focus in their concurring opinions on the reasons the majority opinion carefully limits its holding to "announced plans" to commit perjury. The tensions between the rights of the accused and the obligations of her

attorney are considerable in the context of potential client perjury. Justice Stevens points to the potential inaccuracy of a lawyer's perception. For many reasons, a lawyer's perception may be incorrect. Ideally, a client will tell her lawyer "everything." But "everything" may not be one consistent explanation of an event. Not only may a client overlook and later recall certain details, but she may also change intended testimony in an effort to be more truthful. Moreover, even a statement of an intention to lie on the stand does not necessarily mean the client will indeed lie once on the stand. Once a client hears the testimony of other witnesses, takes an oath, faces a judge and jury, and contemplates the prospect of cross-examination by opposing counsel, she may well change her mind and decide to testify truthfully.

As Justice Blackmun observes, an attorney who acts on a belief of possible client perjury takes on the role of the fact finder, a role which perverts the structure of our adversary system. A lawyer who judges a client's truthfulness does so without the many safeguards inherent in our adversary system. He likely makes his decision alone, without the assistance of fellow fact finders. He may consider too much evidence, including that which is untrustworthy. Moreover, a jury's determination on credibility is always tempered by the requirement of proof beyond a reasonable doubt. A lawyer, finding facts on his own, is not necessarily guided by such a high standard. Finally, by taking a position contrary to his client's interest, the lawyer may irrevocably destroy the trust the attorney-client relationship is designed to foster. That lack of trust cannot easily be confined to the area of intended perjury. It may well carry over into other aspects of the lawyer's representation, including areas where the client needs and deserves zealous and loyal representation. For these reasons and others, it is absolutely essential that a lawyer have a firm factual basis

---

5. We note that under the Minnesota Rules of Professional Conduct, "[a] lawyer may refuse to offer evidence that he reasonably believes is false." Rule 3.3(a)(4)(c). This rule is fully consistent with the obligation under the Constitu-

tion to establish a firm factual basis for believing the client intends to testify falsely. Because of the gravity of a decision to notify a court of potential client perjury, a reasonable lawyer would only act on a firm factual basis.

before adopting a belief of impending perjury.

The record before us does not disclose whether Jackson's lawyer had a firm factual basis for believing his client would testify falsely. This can only be adequately determined after an evidentiary hearing.

*Second,* in *Whiteside,* the defendant did testify and was " 'restricted' or restrained only from testifying falsely." 475 U.S. at 172, 106 S.Ct. at 997. Here, Jackson did not testify at all. It simply is impossible to determine from the record before us whether Jackson was "restrained" by his lawyer from giving truthful testimony. Again, this can only be determined after an evidentiary hearing.

*Third,* in *Whiteside,* the defense attorney did not reveal his belief about his client's anticipated testimony to the trial court. In contrast, the disclosure to the trial court here was quite explicit. The attorney said to the judge that he might have to withdraw because of what might be elicited on the stand.

Such a disclosure cannot be taken lightly. Even in a jury trial, where the judge does not sit as the finder of fact, the judge will sentence the defendant, and such a disclosure creates "significant risks of unfair prejudice" to the defendant. *Holloway v. Arkansas,* 435 U.S. 475, 487 n. 11, 98 S.Ct. 1173, 1180 n. 11, 55 L.Ed.2d 426 (1978).[6]

We note that, once the possibility of client perjury is disclosed to the trial court, the trial court should reduce the resulting prejudice. It should limit further disclosures of client confidences, inform the attorney of his other duties to his client, inform the defendant of her rights, and determine whether the defendant desires to waive any of those rights.

The trial judge here acted primarily with these concerns in mind. The judge discussed the conflict with only the attorney and his client present. He prevented further disclosures of client confidences. He advised Jackson of his right to testify and determined that Jackson understood his rights and his attorney's ethical obligation not to place false testimony before the court. He advised Jackson that if he took the stand, his lawyer would be required to refrain from questioning Jackson on issues which the lawyer believed Jackson would perjure himself and that Jackson would have to testify in narrative form.[7] He then directly asked Jackson if he wished to testify. We add that a trial court should also impress upon defense counsel and the defendant that counsel must have a firm factual basis before further desisting in the presentation of the testimony in question.[8]

Under such a procedure, the chance for violations of the defendant's constitutional

---

6. Before disclosing to the court a belief of impending client perjury, not only must a lawyer have a firm factual basis for the belief that his or her client will commit perjury, but the lawyer must also have attempted to dissuade the client from committing the perjury. See *Whiteside,* 475 U.S. at 169, 106 S.Ct. at 996 ("It is universally agreed that, at a minimum, the attorney's first duty when confronted with a proposal for perjurious testimony is to attempt to dissuade the client from the unlawful course of conduct."). Such dissuasion is usually in the defendant's interest because, as Justice Stevens observes, "perjured testimony can ruin an otherwise meritorious case." *Id.* at 190, 106 S.Ct. at 1007.

7. When a lawyer is confronted during trial with the prospect of client perjury, allowing the defendant to testify in narrative form was recommended by the American Bar Association in its Standards for Criminal Justice, Proposed Standard 4–7.7 (2d ed. 1980). This Standard, however, has not been in force since 1979 when the American Bar Association House of Delegates failed to approve it. It has been criticized because it would indicate to the judge and sophisticated jurors that the lawyer does not believe his client, see, e.g., J. McCall, Nix v. Whiteside: The Lawyer's Role in Response to Perjury, 13 Hastings Const. L.Q. 443, 469, and because the lawyer would continue to play a passive role in the perjury. See *Whiteside,* 475 U.S. at 170 n. 6, 106 S.Ct. at 996 n. 6 (commenting on the Model Rules of Professional Conduct). In this case, these concerns were largely removed because the judge had already been notified of the potential perjury and because the judge had instructed the attorney to proceed in this manner.

8. We believe a trial court should also specifically inform a defendant of the possible consequences of false testimony: (1) the lawyer may reveal to the court what he believes to be false; (2) the lawyer may refrain from referring to the false testimony in final argument; and (3) the defendant may be prosecuted for perjury.

rights will be reduced, the revelation of further client confidences will be prevented, and the defendant can make a knowing waiver of her constitutional right to testify and to counsel. *See Johnson v. Zerbst,* 304 U.S. 458, 468–69, 58 S.Ct. 1019, 1024–25, 82 L.Ed. 1461 (1938).[9] It will also be necessary to establish that the waiver was voluntary and that the defendant's rights were not violated prior to the waiver. Such inquiries, however, are best made at an evidentiary hearing.

CONCLUSION

The most weighty decision in a case of possible client perjury is made by the lawyer who decides to inform the court, and perhaps incidentally his adversary and the jury, of his client's possible perjury. This occurs when the lawyer makes a motion for withdrawal (usually for unstated reasons) or allows his client to testify in narrative form without questioning from counsel. Once this has been done, the die is cast. The prejudice will have occurred. At a minimum, the trial court will know of the defendant's potential perjury. For this reason, defense counsel must use extreme caution before revealing a belief of impending perjury. It is, as Justice Blackmun noted, "the rarest of cases" where an attorney should take such action.

Once the disclosure of the potential client perjury has occurred, the trial judge can limit the resulting prejudice by preventing further disclosures of client confidences, by informing the attorney of the obligation to his client, and by informing the client of her rights and determining whether she desires to waive any of them.

The determination whether the prejudice was undue must occur at an evidentiary hearing. Two alternatives are available in this case for an evidentiary hearing:[10] either on remand or on a motion by Jackson at a 28 U.S.C. § 2255 proceeding. In *United States v. Dubray,* 727 F.2d 771, 772 (8th Cir.1984) (per curiam), we observed that claims of ineffective assistance of counsel are normally raised for the first time in collateral proceedings. Since Jackson's claim is, in part, one of ineffective assistance of counsel, we hold that a collateral proceeding would be the proper forum to address the claimed violations of Jackson's rights to effective assistance of counsel and to testify.

We therefore affirm the judgment of the district court but without prejudice to Jackson to claim in a section 2255 proceeding an infringement of his rights to effective assistance of counsel and to testify.

BOWMAN, Circuit Judge, concurring.

I agree that the convictions of Long and Jackson should be affirmed, and I therefore concur in the Court's decision. I believe the Court errs, however, by going into the merits of Jackson's claim that his trial counsel was ineffective. That claim was not raised in the district court; Jackson has raised it for the first time in this appeal.

In this circuit, there is a well-established practice of refraining from addressing on direct appeal claims that the defendant's

---

**9.** The right to effective counsel and the right to testify are recognized as fundamental rights which only the defendant can waive. *See Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) (right to counsel is a fundamental right which only the defendant can waive); *United States v. Curtis,* 742 F.2d 1070, 1076 (7th Cir.1984), *cert. denied,* 475 U.S. 1064, 106 S.Ct. 1374, 89 L.Ed.2d 600 (1986) (defendant's right to testify on own behalf is a personal right which cannot be waived by counsel).

**10.** Various methods have been suggested by commentators as an alternative to such a post hoc procedure. For example, one suggests that before allowing a defendant to give what a lawyer believes is perjurious testimony, a recess should be called, and a judge, other than the presiding judge, should hold a hearing and determine beyond a reasonable doubt that the defendant would commit perjury by testifying. *See* C. Rieger, "Client Perjury: A Proposed Resolution of the Constitutional and Ethical Issues," 70 Minn.L.Rev. 121, 153 (1985). Another suggests creating a board of attorneys to decide ethical issues. *See* Erickson, The Perjurious Defendant: A Proposed Solution to the Defense Lawyer's Conflicting Ethical Obligations to the Court and to His Client, 59 Den.L.J. 75, 88–91 (1981). Either of these procedures would assist attorneys in determining whether there is a firm factual basis for believing a client is about to commit perjury, although we do not say, at this point, that the Constitution necessarily requires their implementation.

trial counsel was ineffective. We refrain from examining such claims because "(1) it would be inappropriate for us to examine the merits of the claim if the trial court has not done so and (2) our failure to address the incompetency of counsel issue will not prejudice the appellant." *United States v. Holy Bear*, 624 F.2d 853, 856 (8th Cir.1980). *Accord United States v. Dubray*, 727 F.2d 771, 772 (8th Cir.1984) (per curiam) ("this court should not address appellant's claims of ineffective assistance of counsel on direct appeal because appellant did not present the claims to the district court and the record is undeveloped"); *United States v. Briscoe*, 574 F.2d 406, 409 n. 2 (8th Cir.) (per curiam), *cert. denied*, 439 U.S. 858, 99 S.Ct. 173, 58 L.Ed.2d 165 (1978) (claim of ineffective assistance of trial counsel raised initially on appeal "is not properly before us"); *United States v. Hancock*, 558 F.2d 1300, 1303 (8th Cir.) (per curiam), *cert. denied*, 434 U.S. 872, 98 S.Ct. 219, 54 L.Ed.2d 152 (1977) (court "decline[s] to review" the issue of ineffective assistance not raised at trial).

The same rule obtains in other circuits, for the same reasons. *See, e.g., United States v. Reveron Martinez*, 836 F.2d 684, 688 (1st Cir.1988); *United States v. Edmondson*, 818 F.2d 768, 769 (11th Cir. 1987) (per curiam); *United States v. Debango*, 780 F.2d 81, 86 n. 5 (D.C.Cir.1986); *United States v. Colon–Padilla*, 770 F.2d 1328, 1334 n. 6 (5th Cir.1985); *United States v. Jarrett*, 705 F.2d 198, 209 (7th Cir.1983), *cert. denied*, 465 U.S. 1004, 104 S.Ct. 995, 79 L.Ed.2d 228 (1984); *United States v. Boffa*, 688 F.2d 919, 938 (3d Cir. 1982), *cert. denied*, 460 U.S. 1022, 103 S.Ct. 1272, 75 L.Ed.2d 494 (1983); *United States v. Johnson*, 434 F.2d 827, 830–31 (9th Cir. 1970). *See also* 3 C. Wright, Federal Practice & Procedure: Criminal 2d § 601, at 514 (1982) ("Issues not raised in the trial court cannot be considered on appeal.")

We should adhere in this case to the settled practice that the foregoing cases exemplify. It is both inappropriate and unwise for an appellate court to consider on appeal issues that the trial court has not had an opportunity to consider and with respect to which a record has not been developed. For that reason, I would simply have noted that Jackson's ineffective assistance of counsel claim is not properly before us, pointed out that he may raise this claim in the District Court by means of proceedings under 28 U.S.C. § 2255, and said no more.