PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

v.

PAUL DAMERON MIDGETT,
          *Defendant-Appellant.*

No. 01-4674

Appeal from the United States District Court
for the Western District of North Carolina, at Charlotte.
Lacy H. Thornburg, District Judge.
(CR-99-181)

Argued: May 9, 2003

Decided: September 4, 2003

Before TRAXLER, KING, and GREGORY, Circuit Judges.

---

Vacated and remanded by published opinion. Judge Traxler wrote the
opinion, in which Judge King and Judge Gregory joined.

---

## COUNSEL

**ARGUED:** Charles Robinson Brewer, Asheville, North Carolina, for
Appellant. Kenneth Michel Smith, Assistant United States Attorney,
Charlotte, North Carolina, for Appellee. **ON BRIEF:** Robert J. Con-
rad, Jr., United States Attorney, Charlotte, North Carolina, for Appel-
lee.

**OPINION**

TRAXLER, Circuit Judge:

In November 2000, Paul Dameron Midgett was convicted of damaging a vehicle by means of fire and injuring another thereby in violation of 18 U.S.C.A. § 844(i) (West 2000), bank robbery in violation of 18 U.S.C.A. § 2113(a) (West 2000), and threatening a bank teller with gasoline in the course of a bank robbery in violation of 18 U.S.C.A. § 2113(d) (West 2000). He received life sentences on all three convictions under the federal "three strikes" law. *See* 18 U.S.C.A. § 3559(c) (West 2000). Because the court erred in forcing Midgett to choose between his right to a lawyer and his right to testify on his own behalf, we vacate and remand for a new trial.

I.

In October 1999, J. W. Shaw, Jr., was eating lunch in his van at a worksite in Mecklenburg County, North Carolina, when a man approached him with a cup of gasoline, threw it in his face, and demanded his money. After Shaw gave the man his billfold, the assailant ignited the gasoline with a lighter, inflicting burns to Shaw's face, neck, ears, and hands. In November 1999, Paul Midgett and Theresa Russell were charged with this crime (Count One), as well as with using a similar technique later the same day to rob a bank in Union County, North Carolina (Counts Two and Three). Russell eventually agreed to cooperate with the government; Midgett decided to go to trial.

From the outset, Midgett and his lawyer appear to have been at odds. Before trial began, Midgett's lawyer moved to withdraw because of disagreements with his client as to how to proceed. Among other matters, Midgett complained about his lawyer's degree of preparation and his unwillingness to pursue certain issues to Midgett's satisfaction — including a "third person" defense Midgett sought to offer in relation to the Count One crime. Midgett steadfastly maintained to his lawyer that a friend of Russell was driving around with the two of them at the time they encountered Shaw. According to Midgett, it was Russell's friend, and not Midgett, who had committed the assault on Shaw, while Midgett lay in a drug-induced sleep in the back of the

vehicle. Midgett was prepared to offer this testimony himself, but his lawyer did not want Midgett to take the stand because he did not believe Midgett's version of events.

Notified of problems emerging between client and attorney prior to trial, the court conducted a hearing and determined that there was no reason justifying withdrawal, Midgett's counsel having demonstrated due diligence in planning and preparing for trial. For the first of several times, the court offered Midgett the choice of proceeding on his own or continuing with his lawyer. Midgett remarked that "there's no way I could do it myself," J.A. 55, and so his lawyer remained. The next day, before the jury was impaneled, the court asked Midgett whether he intended to testify, to which Midgett replied, "We haven't made a decision yet and I really — to be honest, my lawyer really doesn't want me, but I kind of wanted to, but we haven't made a decision yet." J.A. 69. Trial began and several government witnesses testified, from whom defense counsel was able on cross-examination to bring out certain facts helpful to Midgett. For example, Midgett's lawyer elicited that Shaw had not been able to identify Midgett in a photographic lineup and that another witness to the attack on Shaw had described the culprit to investigators as a tall individual (Midgett being relatively short).

Later that day, after a private conference with Midgett, his lawyer announced to the court that he "must pursuant to the rules of professional conduct move to withdraw." J.A. 138. The judge and Midgett's counsel then left the courtroom for what appears to have been an off-the-record discussion which neither Midgett nor the government attorney attended.[1] When they returned, the court addressed Midgett:

> [Y]our attorney explains to me that you are requesting him
> to offer evidence and present a defense which he does not
> intend to offer and considers improper to make . . . and has
> so advised you, but you nevertheless insist that you are
> going to offer the defense, whatever it is, if he doesn't . . . .
> I have told him that I will give you the option of proceeding
> without an attorney from this point or continuing in his rep-

---

[1]No objection to this hearing has been presented to us and we express no opinion on a conference of this nature.

> resentation . . . . So you better talk with [him] and let me
> know if you want him to continue to represent you or if you
> want him to step aside and we'll continue the trial.

J.A. 139, 140. Midgett ultimately responded that "I'll continue with
[him] being my attorney, but I don't want it, I do it under protest. I
do not agree with it at all." J.A. 141-42. The court instructed Midgett's counsel to describe in an affidavit filed under oath and under
seal with the court his reasons for declining to offer the defense proposed by Midgett.[2] The government then continued its case, during
which defense counsel subjected Midgett's co-defendant Theresa
Russell to cross examination as to the favorable plea agreement she
expected in exchange for her testimony against Midgett.

   The following day, after the government rested its case and Midgett's motion for acquittal was denied, the court asked whether the
defense had evidence to present. Again, Midgett's lawyer raised the
issue of his conflict with his client. Defense counsel stated that he had
repeatedly recommended to Midgett that testifying was not in his best
interests. At the court's prompting, Midgett's lawyer further asserted
that

> I indicated to you in chambers that I felt I needed to withdraw because I was duty bound to make that motion, and
> you directed me to tell you why, and at that point I indicated
> that it is my belief that Mr. Midgett is going to offer information when he testifies that is not in any way truthful or
> in existence that I can determine from any source. . . . [A]nd
> based on what has been represented to me and I understand
> is about to happen if and when he takes the stand, I am duty
> bound to move to withdraw at this point. I can say that the
> issue relates to whether or not a third person was at the
> scene at the time of the destruction incident when Mr. Shaw
> was burned, a third person actually did the act. And I have
> investigated that, I have asked for an identity from this supposed person. I have asked the co-defendant directly

---

[2]We have examined this affidavit, and found no new information in it
necessary to the resolution of the issues before us.

whether this person exists . . . . There's nothing whatsoever that I can find to corroborate any such representation.

J.A. 297-98. Rather than permitting his lawyer to withdraw, the court offered Midgett the choice of either acceding to defense counsel's refusal to put him on the stand or representing himself without further assistance of counsel. Midgett repeated that he did not "feel . . . qualified to [represent himself] . . . I'm saying I want to [take the stand], but I can't." J.A. 300. In response, Midgett's lawyer told the court:

> I don't think he's being denied his right to testify. He's got a choice here today what he wants to do. He knows the parameters. I have asked him a number of times to give me the name or a way to find this person, and he can't do it and no one else corroborates it.

J.A. 301. The court agreed, stating that "if the defendant chooses to take the witness stand, I will permit [him] to withdraw." J.A. 302. Midgett responded: "I say again, Your Honor, I want to take the witness stand, but I can't because I can't do it without counsel." J.A. 302. The court finally told Midgett that

> if there is any problem with your taking the stand and not being able to take the stand because of your wanting to bring before the jury an issue that doesn't exist and for which you have absolutely no evidence to offer other than your own testimony, . . . the court is of the opinion that any resulting problem is a problem of your own making, and the trial will not be further delayed . . . . The time has come that we're going to finish the case, and you and the appellate courts may take it from there.

J.A. 303. Midgett declined to testify and his lawyer offered no other evidence. In his closing statement, defense counsel referred to various weaknesses and inconsistencies in the statements of certain witnesses, including Theresa Russell's motive to give testimony favorable to the government and Shaw's inability to identify Midgett in the photographic lineup. The jury took little time to convict Midgett on all three counts.

After trial the court granted defense counsel's motion to withdraw, stating that:

> It was clear throughout the course of the trial that [Midgett] repeatedly conferred with counsel and was satisfied with counsel's performance except as it related to . . . [the] defense that a third party was responsible for the crime charged in Count One, when counsel's thorough investigation and the overwhelming evidence indicated the guilt of the Defendant and no one else.

J.A. 372. New counsel was appointed and immediately filed a motion for new trial, which was denied; several further motions for new trial were subsequently filed and denied in turn. This appeal by new counsel followed.

Midgett raises several issues on appeal. In particular, he claims that the district court erred in conditioning his right to counsel on his waiver of his right to testify. It is to this issue that we now turn.[3]

## II.

The question of what a lawyer should do when confronted by potentially perjurious testimony has long caused consternation in the legal profession, producing heated debate and little consensus. On the one hand are the series of constitutional rights to which a defendant is entitled and for which the defendant's lawyer is called to provide

---

[3]Because this issue is dispositive, we need not reach Midgett's claim that the court erred in denying him a new trial based on evidence he advanced that his competence might have been impaired at the time of his trial by an overdose of an anti-seizure drug, Dilantin. We note, however, that the court's interpretation of the medical evidence presented on this issue and the court's first-hand observation of Midgett's demeanor, conduct, and competence withstand suggestions of an abuse of discretion. As to Midgett's other claim, that the court erred in sentencing him to life based on what were characterized in his PSR as qualifying "three strikes" predicate convictions, we note that the court may re-evaluate Midgett's arguments on this issue should it later prove necessary to do so.

zealous advocacy; on the other hand are the lawyer's obligations to the court to seek the furtherance of justice. Similarly, the court itself is obliged to ensure that the constitutional rights of the defendant are protected, while also seeing that proceedings are conducted fairly and truthfully. Midgett argues that these obligations were not adequately met when his lawyer, disbelieving Midgett's proffered testimony, sought to withdraw from representing him and approached the court to discuss the lack of corroborative evidence in support of Midgett's case. Likewise, Midgett argues that the court should not have confronted him with a choice between exercising his right to take the stand and his right to be represented by counsel. Under these circumstances, we agree.

The Sixth Amendment guarantees a criminal defendant the right to the assistance of counsel at trial. *See*, *e.g.*, *Gideon v. Wainwright*, 372 U.S. 335 (1963). It is also clear that a criminal defendant has a constitutional right to testify on his own behalf at trial. *See Rock v. Arkansas*, 483 U.S. 44 (1987). Although the right to testify is not explicitly set forth in the Constitution, we find its origins in the due process clause of the Fourteenth Amendment, the compulsory process clause of the Sixth Amendment, and as a "necessary corollary to the Fifth Amendment's guarantee against compelled testimony." *Id.* at 52. Notwithstanding its constitutional stature, however, the defendant's right to testify is "not unlimited." *United States v. Teague*, 953 F.2d 1525, 1530 (11th Cir. 1992) (en banc). In particular, "the right to testify clearly does not include the right to commit perjury." *Id.* This limitation was explicitly recognized in *Nix v. Whiteside*, 475 U.S. 157 (1986), the case upon which the government relies in answer to Midgett's argument on appeal.

In *Nix*, the defendant expressly indicated to his lawyer that he intended to perjure himself at trial by offering testimony that he had seen a gun in the hand of his victim, when he had previously told his lawyer that he had not seen a gun, but only feared that the victim had one. The defendant made clear to his lawyer that he had not seen a weapon, but thought that testifying to having seen one was necessary to persuade the jury of his innocence. On pain of withdrawal, his lawyer would not allow him to testify to his having seen the gun. Although the defendant alleged that his lawyer's refusal to allow him to testify as he proposed constituted ineffective assistance of counsel

under the Sixth Amendment, the Supreme Court disagreed, conclud-
ing that the "right to counsel includes no right to have a lawyer who
will cooperate with planned perjury." *Nix*, 475 U.S. at 173. Under
*Nix*, then, the defendant's right to counsel and his right to testify on
his own behalf are circumscribed in instances where the defendant has
made manifest his intention to commit perjury. Unlike *Nix*, however,
where the defendant actually admitted to his lawyer that he planned
to perjure himself, Midgett never told his lawyer or otherwise indi-
cated to him that his intended testimony was perjurious. Rather, Mid-
gett consistently maintained that his third-person defense was true and
that he believed his co-defendant could corroborate his story.

The question, then, is whether the information known to defense
counsel was sufficient to show that Midgett's testimony would be per-
jurious so as to bring this case within the rule set forth in *Nix*. We
conclude that it was not. We recognize that Midgett's "mystery man
did it" defense lacked other corroboration. Among other things, Mid-
gett's co-defendant actually testified that no one else was in the van
during the arson/robbery, and, although he had been unable to do so
in an earlier photographic line-up, Shaw did identify Midgett in court
as his assailant. Midgett also sent a letter to Shaw that might have
been interpreted by the jury as a feeble apology for what had hap-
pened to the victim — though the letter is altogether too vague and
indirect to be described as an acknowledgment of guilt.

Notwithstanding these obstacles to his case, Midgett had appar-
ently been consistent in his interviews with his lawyer that a third per-
son committed the Count One crime and that he did not. Defense
counsel's responsibility to his client was not dependent on whether he
personally believed Midgett, nor did it depend on the amount of proof
supporting or contradicting Midgett's anticipated testimony regarding
how the incident happened. In this situation, Midgett never indicated
to his attorney that his testimony would be perjurious. Thus, his law-
yer had a duty to assist Midgett in putting his testimony before the
jury, which would necessarily include his help in Midgett's direct
examination. *Nix*, 475 U.S. at 189 (Blackmun, J., concurring)
("Except in the rarest of cases, attorneys who adopt the role of the
judge or jury to determine the facts pose a danger of depriving their
clients of the zealous and loyal advocacy required by the Sixth

Amendment." (internal quotation marks, citations, and punctuation omitted)).

Defense counsel's mere belief, albeit a strong one supported by other evidence, was not a sufficient basis to refuse Midgett's need for assistance in presenting his own testimony. *See United States ex rel. Wilcox v. Johnson*, 555 F.2d 115, 122 (3d Cir. 1977) ("While defense counsel in a criminal case assumes a dual role as a zealous advocate and as an officer of the court, neither role would countenance disclosure to the Court of counsel's private conjectures about the guilt or innocence of his client. It is the role of the judge or jury to determine the facts, not that of the attorney." (internal quotation marks omitted)). This assessment is consistent with Rule 3.3(a)(3) of the Model Rules of Professional Conduct, which requires that a lawyer "not knowingly offer evidence that the lawyer *knows* to be false," but also states that "[a] lawyer may refuse to offer evidence, *other than the testimony of a defendant in a criminal matter*, that the lawyer *reasonably believes* is false." (emphasis added). Far-fetched as Midgett's story might have sounded to a jury, it was not his lawyer's place in these circumstances to decide that Midgett was lying and to declare this opinion to the court. *Cf. United States v. Shaffer Equip. Co.*, 11 F.3d 450, 459 (4th Cir. 1993) (observing that "a mere suspicion of perjury by a client does not carry with it the obligation to reveal that suspicion to the court under [West Virginia's] Rule 3.3"); *Hoke v. Netherland*, 92 F.3d 1350, 1360 (4th Cir. 1996) (noting that mere beliefs on the part of a lawyer, even if "directly contradictory in substance" to the testimony of a witness, are different from knowledge of falsity and do not suffice to establish subornation of perjury (internal citations omitted)).

As this discussion makes clear, we believe Midgett's trial lawyer failed to carry out his duty to zealously defend his client. The issue on appeal, however, is not whether counsel was ineffective so as to warrant a new trial, but whether the district court erred by forcing Midgett to choose between testifying or retaining counsel. We believe that, in the circumstances of this case, the court did err in this regard, given that the court effectively mirrored defense counsel's error by deciding that Midgett's testimony would be perjurious. To be sure, the court had an obligation not to permit *known* perjury from being placed before the jury, *see Nix*, 475 U.S. 162. In this case, however,

the court merely believed the defendant's potential testimony would be dramatically outweighed by other evidence, a situation that did not warrant the extreme sanction imposed by the court.

The record reveals that, during the colloquy after the close of the government's case, the court defended the choice it imposed on Midgett by declaring that "your wanting to bring before the jury an issue that doesn't exist and *for which you have absolutely no evidence to offer other than your own testimony . . .* [amounts to] a problem of your own making." J.A. 303 (emphasis added). Thus, the court based its ultimatum on an inappropriate weighing of the evidence. Specifically, the court treated as irrefutable proof of an intent to commit perjury the fact that Midgett did not produce corroborating witnesses and sought merely to offer his own testimony. The defendant was told to waive either his right to counsel or his right to testify because neither his counsel nor the court was satisfied that his testimony would be truthful. In so doing, the court leveled an ultimatum upon Midgett which, of necessity, deprived him of his constitutional right to testify on his own behalf. *See Johnson*, 555 F.2d at 120-21 ("A defendant in a criminal proceeding is entitled to certain rights. . . . He is entitled to all of them; he cannot be forced to barter one for another. When the exercise of one right is made contingent upon the forbearance of another, both rights are corrupted."). Forcing this "Hobson's choice" upon the defendant constituted error that calls for a new trial.

### III.

We conclude that, in the circumstances of this case, the court impermissibly forced the defendant to choose between two constitutionally protected rights: the right to testify on his own behalf and the right to counsel. Because all three convictions were affected by this error, each is vacated and the case remanded for a new trial.

*VACATED AND REMANDED*