NO. 4-02-0944

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

THE PEOPLE OF THE STATE OF ILLINOIS,

Plaintiff-Appellee,

v.

CORY W. CALHOUN,

Defendant-Appellant.

)

)

)

)

)

)

)

)

Appeal from

Circuit Court of

Adams County

No. 99CF66

Honorable

Scott H. Walden,

Judge Presiding.

____________________________________________________________________________________

JUSTICE STEIGMANN delivered the opinion of the court:

This case requires us to determine whether criminal defense counsel may properly force his client to choose between testifying without his counsel's assistance or not testifying at all, when defense counsel's determination that his client will commit perjury on the witness stand is based solely on counsel's assessment of the evidence.  We hold that he may not. 

I. BACKGROUND

In February 1999, the State charged defendant, Cory W. Calhoun, with residential burglary of Sarah Louderback's home.  Evidence presented at defendant's May 1999 jury trial showed that on February 22, 1999, defendant, who was driving Louderback's Chevy Blazer, dropped Louderback off at work and then drove her son, David, to his babysitter's house.  Later that day, Louderback reported to police that her Chevy Blazer and certain items from inside her home were missing.  Later that night, defendant was arrested in Hannibal, Missouri, after Hannibal police spotted Louderback's Blazer, pulled it over, and found defendant at the wheel.  Some of Louderback's missing items were found in the Blazer.  Louderback testified at trial that she and defendant were friends but had never dated.    

The jury convicted defendant of residential burglary (720 ILCS 5/19-3 (West 1998)), and the trial court later sentenced him to 11 years in prison and ordered him to pay $420 in restitution and $331 in court costs.  The court also ordered the Department of Corrections (DOC) to withhold 50% of defendant's DOC wages and remit those funds to the circuit clerk to be applied toward the amounts due for restitution and costs.

Defendant appealed, arguing that (1) the State failed to prove him guilty beyond a reasonable doubt; (2) he was denied effective assistance of counsel at trial and in posttrial proceedings; and (3) the trial court lacked the authority to order the withholding of his DOC wages.  This court agreed with only defendant's third argument and thus affirmed his conviction and remanded with directions.  
People v. Calhoun
, No. 4-99-0560 (November 13, 2000) (unpublished order under Supreme Court Rule 23).

In October 2001, defendant 
pro
 
se
 filed a petition for relief under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 through 122-8 (West 2000)), and the trial court later appointed postconviction counsel for defendant.  

In February 2002, postconviction counsel filed an amended postconviction petition, alleging that (1) defendant's trial counsel was ineffective in that he failed to (a) assist defendant in testifying in his own defense, (b) obtain phone records to impeach a State's witness, and (c) perfect defendant's appeal of his sentence; (2) defendant was denied due process in that the amount he was ordered to pay in restitution was not supported by the evidence; and (3) defendant's 11-year sentence constituted cruel and unusual punishment.  Later in February 2002, the State filed a motion to dismiss defendant's amended postconviction petition.  

Following a February 2002 hearing, the trial court granted the State's motion to dismiss defendant's amended postconviction petition as to all of defendant's claims except his claim that his trial counsel provided ineffective assistance when he refused to assist defendant in presenting his testimony.  As to that claim, the trial court granted defendant an evidentiary hearing. 

At the July 2002 evidentiary hearing, defendant testified that he and his trial counsel, Randall Prizy, first discussed whether defendant would testify after the trial court denied his motion for a directed verdict.  In the trial court's chambers following that denial, Prizy informed the court that the defense would not be putting on any evidence and he did not believe defendant would be testifying.  Defendant interrupted and stated that he "had" to testify.  The court then gave defendant and Prizy time to discuss the matter outside chambers.  

In the hallway outside the trial court's chambers, Prizy explained to defendant that it would not be wise for him to testify because if he did so, all of his prior convictions would hurt him.  Defendant and Prizy argued "vehemently."  When they returned to the court's chambers, the court explained to defendant that his prior convictions could be a grave concern.  The court asked the prosecutor what defendant's prior convictions were, and he informed the court of a few but did not have a complete listing with him.  Defendant said that he needed to testify, and he and Prizy again stepped outside chambers.  Prizy began by saying to defendant, "How is it going to look if you get up to testify and I got no questions to ask you?"  Defendant was "stunned" and went back into the court's chambers and said that he was not going to testify.  Defendant acknowledged that the court had earlier admonished him regarding his right to testify.

Defendant further testified that (1) he never told Prizy that he was guilty and had not told Prizy what he would testify to if he took the stand; (2) he and Prizy did not discuss whether his testimony would be truthful, only that his prior convictions would hurt him; and (3) he did not testify because Prizy would not help him do so.  Defendant also testified that he did not tell the trial court that Prizy said he would not help him testify and explained as follows: "Well I was stunned.  I wish I would have now."  

Prizy testified as follows regarding his first conversation with defendant following the trial court's denial of the motion for directed verdict.   

"Generally it was one in which it was my advice to him not to take the stand generally because of his prior convictions.  He had quite a few felony convictions we had dealt with.  I didn't do a motion to see if we could get any of those felonies thrown out because it was my intention and my hope that [defendant] elected [
sic
] not to take the stand because I wasn't comfortable with his felony convictions and I also wasn't comfortable with his version of the events of that particular day where he was charged with theft and the residential burglary.  So I was leaning towards advising him not to take the stand."

Prizy did not remember the conversation exactly but stated that they did discuss his discomfort with defendant's version of events.  Prizy acknowledged that he learned defendant's version of events months earlier--three or four days after he was appointed to represent defendant and prior to defendant's preliminary hearing.  Between the preliminary hearing and trial, Prizy and defendant discussed defendant's version of events "numerous times."  Defendant's version was consistent each time they discussed it.  

During their second conversation outside the trial court's chambers, Prizy and defendant covered the same ground.  Defendant told Prizy that (1) he wanted the jury to hear his story; (2) Louderback was lying; and (3) the jury would believe him.  When asked whether a discussion occurred about the way the trial would proceed if defendant testified, Prizy replied, as follows:

"When the situation comes to that, sometimes --I sometimes will tell a defendant, and I don't remember if I told [defendant] this, but I may have told him that if by chance he testified, that it might be a narrative form because I still wasn't at all comfortable with his testimony.  And I may have told him that he may have a better chance at telling the jury anything and everything that he wanted to, but it would be a narrative, it wouldn't be a question and answer period from me, it would be me getting up and asking him to give his own version, but we needed the [c]ourt's consent to do that.  And if we did that and that was allowed, it was my opinion to him that the jury would sense that something funny was going on and they might not like it and they would more so scrutinize his testimony." 

Prizy did not recall whether he said this to defendant.  At the end of their conversation, defendant decided not to testify.  Defendant never appeared to be shocked, upset, or alarmed by what Prizy told him.  Prizy acknowledged that on the day of trial, he and defendant had some heated conversations and were unhappy with each other.  He further acknowledged that defendant was convinced of the truth of his version of events.  

Prizy also testified that (1) he was convinced that defendant was going to commit perjury; and (2) he did not want defendant to get into any more legal trouble.  When asked what it was about defendant's version of events that caused Prizy to believe it would be perjurious, Prizy replied, as follows: 

"A lot of very simple things to a lot of complicated things. [Defendant] maintained that he and [Louderback] were boyfriend, girlfriend. [Louderback] said that was not remotely true, that they were friends, no more no less, but because of this that they were no longer friends.  

She had a son by the name of [David]. [Defendant] had asked me to talk to him and subpoena him, I believe he was nine or ten years old at the time, that he would support [defendant's] story.  That he would say that they went back to the house and everything was fine and he was taking care of him, that he didn't take anything in the house and there was no problem, but--basically [defendant] told me that he was a normal good kid who loved his mother and he and [defendant] were good friends.  I met with [David] and his mother three or four days before trial, it was extremely obvious to me that he had large behavior problems.  He could not sit still.  He hit or kicked or slapped his mother five or six times. *** And [defendant] told me that he was a normal, well-behaved child and that just wasn't true.

[Louderback] insisted that she was--that [defendant] had took [
sic
] the car--that [defendant] took her car that morning.  The understanding between them was that he was supposed to take her to work and then he was supposed to take [David] to the baby[]sitter.  And according to [defendant,] they did that, and he was supposed to drop the car off at the house, but he went to Hannibal, Missouri, and beyond.  And he didn't have permission to take the car there and it just didn't match up at all with what [Louderback] said.  And along with [Louderback], from my point of view, she seemed to be telling the truth.  I had to match that up against [defendant's] version along with his multiple felony convictions, it seemed to me that he could be in a perjury situation.

There were a couple of other witnesses that he wanted me to talk to, which I did.  Casey Wellman, the other name will come to me [in] a minute.  I can't remember.  I talked to both of those gentlemen, and [defendant] said they would support his version of everything.  [Wellman] told me that he worked with [defendant] for two or three days, months before, that was it.  He didn't know [Louderback].  He didn't know anything about it.  He didn't even know why I called him.  And the other gentleman, I can't remember his name, he--I talked to him and he basically more or less said the same thing; that he didn't have anything to do with [Louderback] or [defendant] and he didn't know anything about this theft or burglary. *** And all the witnesses that [defendant] gave me I talked to and none of them helped him in his defense." 

Prizy acknowledged that his sense that defendant would be committing perjury was based on the conflict between what defendant said and what the other witnesses said.  Defendant never told Prizy that his version was a lie, nor does the record indicate that defendant deviated in what he wanted to tell the jury from what he had been telling Prizy. 

 Following the July 2002 hearing, the trial court entered a written order denying defendant's amended postconviction petition.  Specifically, the court found that (1) Prizy had made a good-faith determination that defendant would commit perjury if he testified; and (2) thus, he did not provide ineffective assistance of counsel.  

This appeal followed.

II. DEFENDANT'S INEFFECTIVE-ASSISTANCE-OF-COUNSEL CLAIM

Defendant argues that the trial court erred by denying his petition for postconviction relief because he received ineffective assistance of counsel when Prizy refused to assist him in testifying.  Specifically, he contends that Prizy did not have sufficient knowledge that he would commit perjury so as to justify withdrawing the assistance of counsel.  We agree.

A. Standard of Review

At the third stage of postconviction proceedings, we will not reverse the trial court's decision to deny a petitioner's claim after conducting an evidentiary hearing unless it is manifestly erroneous.  
People v. Childress
, 191 Ill. 2d 168, 174, 730 N.E.2d 32, 35 (2000).  "A decision is manifestly erroneous only if it contains error that is 'clearly evident, plain, and indisputable.' "  
People v. Frieberg
, 305 Ill. App. 3d 840, 847, 713 N.E.2d 210, 216 (1999), quoting 
People v. Ruiz
, 177 Ill. 2d 368, 384-85, 686 N.E.2d 574, 582 (1997).

B. Ineffective Assistance of Counsel

To establish ineffective assistance of counsel, a defendant must satisfy the two-pronged test set forth by the United States Supreme Court in 
Strickland v. Washington
, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984).  The 
Strickland
 test requires a defendant to show that (1) his counsel's performance was so seriously deficient as to fall below an objective standard of reasonableness under the prevailing professional norm; and (2) the deficient performance so prejudiced defendant as to deny him a fair trial.  
People v. Nieves
, 192 Ill. 2d 487, 494, 737 N.E.2d 150, 154 (2000).  To successfully claim ineffective assistance of counsel, a defendant "must overcome a strong presumption that the challenged actions of counsel were the product of sound trial strategy."  
People v. Metcalfe
, 202 Ill. 2d 544, 561, 782 N.E.2d 263, 274 (2002).

C. 
Nix v. Whiteside

In 
Nix v. Whiteside
, 475 U.S. 157, 89 L. Ed. 2d 123, 106 S. Ct. 988 (1986), the United States Supreme Court discussed how defense counsel should proceed upon learning that a client will commit perjury upon taking the witness stand.  In that case, the defendant, who was charged with the murder of Calvin Love, raised the theory that he stabbed Love in self-defense.  Up until shortly before the defendant's trial, the defendant consistently told his attorney that although he was convinced that Love had a gun in his hand at the time of the stabbing, he had not actually seen a gun.  However, about a week before trial, while preparing for his direct testimony, the defendant stated that he had seen something metallic in Love's hand.  When asked about this, the defendant responded, in essence, that he had to say he saw a gun in order to win his case. 
 Defense counsel explained to the defendant that he could not assist him in testifying falsely and ultimately persuaded the defendant not to testify that he had seen a gun.  
Whiteside
, 475 U.S. at 160-61, 89 L. Ed. 2d at 131, 106 S. Ct. at 991. 

On collateral attack of his conviction for second-degree murder, the defendant argued that his rights to counsel and to testify in his own defense had been violated because, although he took the stand, his trial counsel had coerced him into not testifying that he had seen a gun.  The Supreme Court held that neither of the defendant's rights was violated because the right to testify does not "extend to testifying falsely" (emphasis omitted) (
Whiteside
, 475 U.S. at 173, 89 L. Ed. 2d at 138, 106 S. Ct. at 997), and the right to counsel does not include the "right to have a lawyer who will cooperate with planned perjury" (
Whiteside
, 475 U.S. at 173, 89 L. Ed. 2d at 139, 106 S. Ct. at 997).  In so holding, the Court wrote that an attorney's duty of confidentiality does not extend to a client's "announced plans to engage in future criminal conduct."  
Whiteside
, 475 U.S. at 174, 89 L. Ed. 2d at 139, 106 S. Ct. at 998.  The Court further wrote that "[w]hen an accused proposes to resort to perjury or to produce false evidence, one consequence is the risk of withdrawal of counsel."  
Whiteside
, 475 U.S. at 174, 89 L. Ed. 2d at 139, 106 S. Ct. at 998.  Accordingly, 
"[f]or defense counsel to take steps to persuade a criminal defendant to testify truthfully, or to withdraw, deprives the defendant of neither his right to counsel nor the right to testify truthfully."  
Whiteside
, 475 U.S. at 173-74, 89 L. Ed. 2d at 139, 106 S. Ct. at 997-98. 

Although 
Whiteside
 established that a defendant's constitutional rights are not violated when his trial counsel takes steps to avoid assisting him in committing perjury, it did not address the precise issue now before us.  In 
Whiteside
, the defendant told his attorney he intended to testify about an exculpatory matter that he had never previously mentioned.  The Court's opinion addressed the appropriate action for an attorney to take under those circumstances.  
Whiteside
 thus did not address what, if anything, short of a defendant's announced intention to commit perjury, constitutes a sufficient basis upon which defense counsel can conclude that his client intends to commit perjury and take those steps the Court deemed appropriate.  This is essentially the question now before us--that is, was the information known to Prizy sufficient to show that defendant's testimony would be perjurious so as to justify Prizy's act of persuading defendant not to testify by threatening to withdraw his assistance
?  Although the United States Supreme Court has not addressed this question, Illinois and other state and federal courts have.

   D. Illinois Law

The Supreme Court of Illinois interpreted 
Whiteside
 in 
People v. Flores
, 128 Ill. 2d 66, 538 N.E.2d 481 (1989).  In that case, the defendant claimed in his postconviction petition and argued on appeal that he had received ineffective assistance of trial counsel when his counsel (1) refused to permit him to testify to a particular alibi and (2) failed to interview or call several witnesses (members of the defendant's family) who would have testified to the same alibi.  
Flores
, 128 Ill. 2d at 103, 538 N.E.2d at 496.  At an evidentiary hearing on the defendant's postconviction petition, defense counsel testified that he had decided not to call the alibi witnesses because their proposed testimony would not have been helpful in light of conflicting admissions the defendant had made.  
Flores
, 128 Ill. 2d at 104-05, 538 N.E.2d at 497.  Defense counsel also testified that (1) the defendant's purported alibi conflicted with statements the defendant had made to the police and (2) the defendant had previously provided defense counsel with three different explanations for his whereabouts at the time of the crime.  
Flores
, 128 Ill. 2d at 105-06, 538 N.E.2d at 497.  The 
Flores
 court then wrote the following: 

"Confronted with the contradictions between what the members of the defendant's family would testify to and what defendant himself had told counsel, [defense counsel] could reasonably have concluded that the presentation of this testimony would have been improper on his part. ***

The defendant argues, however, that unless defense counsel had actual knowledge that the testimony was perjurious, his mere suspicion is insufficient grounds to refuse to call an alibi witness.  We disagree, as defense counsel should have discretion to make a good-faith determination whether particular proposed witnesses for the defendant would testify untruthfully.  Absent some showing that counsel's decision was unreasonable under the circumstances, we cannot say that the defendant was denied a fair trial as a consequence of counsel's election not to call the members of his family to present an alibi.  For the same reason, defense counsel was not incompetent in refusing to permit the defendant to testify to the purported alibi."  
Flores
, 128 Ill. 2d at 107, 538 N.E.2d at 498.

In 
People v. Bartee
, 208 Ill. App. 3d 105, 106, 566 N.E.2d 855, 856 (1991), the Second District Appellate Court considered whether the defendant received ineffective assistance of counsel and was denied a fair trial when the trial court ordered him to testify in the narrative after his defense counsel informed the court that he had to withdraw from the case due to a 
Whiteside
 "problem."  Citing 
Flores
, the Second District held that defense attorneys are afforded "great discretion" in determining whether a client's testimony will constitute perjury.  
Bartee
, 208 Ill. App. 3d at 108, 566 N.E.2d at 857.  Accordingly, the Second District rejected the defendant's argument that he was entitled to a hearing at which his defense counsel would have to show a firm factual basis for his belief that the defendant would testify falsely.  
Bartee
, 208 Ill. App. 3d at 108, 566 N.E.2d at 857.  The court thus concluded that the defendant had not been denied a fair trial or effective assistance of counsel when he was ordered to testify in the narrative.  
Bartee
, 208 Ill. App. 3d at 108, 566 N.E.2d at 857. 

The Second District addressed the issue again in 
People v. Taggart
, 233 Ill. App. 3d 530, 599 N.E.2d 501 (1992).  In that case, prior to presenting the defense, defense counsel went on the record to explain in great detail his investigation of the defendant's purported alibi.  Defense counsel concluded that he could not present any alibi witnesses.  
Taggart
, 233 Ill. App. 3d at 559, 599 N.E.2d at 521.  Later, when the defendant indicated that he would testify, defense counsel stated that based on his conversations with the defendant and ethical considerations, he would only ask the defendant his name and to tell his version of events.  
Taggart
, 233 Ill. App. 3d at 559, 599 N.E.2d at 522.

On appeal, the defendant claimed that he had been deprived of his sixth amendment right to counsel.  In rejecting the defendant's claim, the Second District concluded that defense counsel's reference to "ethical considerations" and explanation for his belief that no basis existed for an alibi defense evinced his good-faith determination that the defendant was going to commit perjury.  
Taggart
, 233 Ill. App. 3d at 560, 599 N.E.2d at 522.  Thus, the court further concluded that the 
Flores
 standard was satisfied.  
Taggart
, 233 Ill. App. 3d at 560, 599 N.E.2d at 522.  The Second District also noted, however, that "[i]n these types of cases, it is important to identify on the record the basis for counsel's belief [that his client will commit perjury] so a proper determination of its reasonableness can be made."  
Taggart
, 233 Ill. App. 3d at 560, 599 N.E.2d at 522. 

E. Defendant's Ineffective-Assistance Claim

In light of 
Flores
, 
Bartee
, and 
Taggart
, we conclude that the trial court in this case applied the correct standard in considering defendant's postconviction claim--namely, whether 
Prizy's decision to offer defendant the choice of testifying in the narrative or not at all was based on a good-faith determination that defendant was going to commit perjury.  We disagree, however, with the trial court's decision because we conclude that Prizy's determination that defendant was going to commit perjury was not reasonable under these circumstances.  See 
Flores
, 128 Ill. 2d at 107, 538 N.E.2d at 498 ("[a]bsent some showing that counsel's decision was unreasonable under the circumstances," counsel should have discretion to make a good-faith determination whether a proposed witness will testify untruthfully).

Nothing in the record shows that defendant would have committed perjury had he testified.  Throughout defendant's discussion of this case with Prizy, defendant's version of events did not waver.  Prizy acknowledged that defendant (1) never told him that he was going to lie and (2) never changed his story.  Prizy also testified that defendant believed his version of events to be truthful.  According to Prizy's own testimony, his determination that defendant would commit perjury was based on (1) his belief that Louderback was more credible than defendant; (2) the discrepancy between (a) defendant's description of David and (b) Prizy's assessment that David would be a poor witness; and (3) Prizy's assessment that two other suggested witnesses would not have been helpful to defendant's case.  In sum, Prizy was not "comfortable" with defendant's story.

Although our supreme court has held that defense counsel has "broad discretion" in determining when a client will commit perjury, such discretion is not unlimited.  A good-faith determination that a client will commit perjury cannot be based merely on defense counsel's assessment of the evidence.  The simple fact that the testimony of other witnesses will contradict the defendant's version of events cannot serve as the basis for defense counsel's conclusion that his client will commit perjury.  To conclude otherwise would effectively be to give defense counsel unlimited discretion to reach such a conclusion, given that such testimonial conflicts arise in most, if not all, criminal cases.  Such conflicts are for the jury to resolve.  Moreover, defense counsel's responsibility to zealously represent his client does not dissipate simply because counsel does not believe his client's story or the weight of the evidence lies in the State's favor.  We thus hold that defense counsel's good-faith determination that his client will commit perjury must rest on some articulable basis, apart from counsel's assessment of the evidence.  

In so holding, we note that the circumstances of this case fall far short of those at issue in 
Whiteside
.  In that case, the defendant announced to defense counsel his intent to testify about an exculpatory matter that he had never previously mentioned.  
Whiteside
, 457 U.S. at 160-61, 89 L. Ed. 2d at 131, 106 S. Ct. at 991.  The facts of this case are also not analogous to the facts in 
Flores
, in which the defendant had provided defense counsel with several conflicting stories.  
Flores
, 128 Ill. 2d at 105-06, 538 N.E.2d at 497.

Instead, the facts of this case are similar to those in  
United States v. Midgett
, 342 F.3d 321 (4th Cir. 2003).  In that case, the defendant never indicated to his defense counsel that he would testify falsely and never changed his story.  
Midgett
, 342 F.3d at 326.  The Fourth Circuit Court of Appeals considered whether the information known to defense counsel was sufficient to show that the defendant's testimony would be perjurious.  In concluding that the trial court had impermissibly forced the defendant to choose between his right to testify and his right to counsel, the Fourth Circuit drew a distinction between "known perjury," which the trial court has an obligation to keep from the jury, and testimony that the court merely believes is outweighed by other evidence.  
Midgett
, 342 F.3d at 327.  In so concluding, the court analyzed the facts of the case, as follows:

"[The defendant] had apparently been consistent in his interviews with his lawyer that a third person committed the [c]ount [o]ne crime and that he did not.  Defense counsel's responsibility to his client was not dependent on whether he personally believed [the defendant], nor did it depend on the amount of proof supporting or contradicting [the defendant's] anticipated testimony regarding how the incident happened.  In this situation, [the defendant] never indicated to his attorney that his testimony would be perjurious.  Thus, his lawyer had a duty to assist [him] in putting his testimony before the jury, which would necessarily include his help in [the defendant's] direct examination.  [
Whiteside
,] 475 U.S. at 189, [89 L. Ed.2d at 149,] 106 S. Ct. [at 1005] (Blackmun, J., concurring) ('Except in the rarest of cases, attorneys who adopt the role of the judge or jury to determine the facts pose a danger of depriving their clients of the zealous and loyal advocacy required by the [s]ixth [a]mendment'.   (internal quotation marks, citations, and punctuation omitted)).

Defense counsel's mere belief, albeit a strong one supported by other evidence, was not a sufficient basis to refuse [the defendant's] need for assistance in presenting his own testimony."  
Midgett
, 342 F.3d at 326.

We find the 
Midgett
 court's analysis persuasive and thus conclude that the trial court's findings that (1) Prizy made a good-faith determination that defendant would commit perjury and (2) defendant thus did not receive ineffective assistance of counsel were manifestly erroneous.  Accordingly, we reverse the court's denial of defendant's postconviction claim and remand with directions to grant defendant a new trial.  In light of our decision, we need not address the other arguments defendant raises.

F. Further Discussion    

Despite our conclusion that Prizy's conduct in this case did not satisfy Illinois' good-faith- determination standard, we nevertheless invite our supreme court to reconsider the appropriateness of that standard.  Although the 
Flores
 court clearly set that standard when it held that "defense counsel should have discretion to make a good-faith determination" as to whether a defendant will commit perjury, the court's analysis was enmeshed with its analysis of defense counsel's strategic decision not to call certain witnesses.  
Flores
, 128 Ill. 2d at 107, 538 N.E.2d at 498.  Yet, that strategic decision is entirely defense counsel's to make (see 
People v. Ramey
, 152 Ill. 2d 41, 54, 604 N.E.2d 275, 281 (1992)) and creates no sixth amendment issues.  This, of course, is in stark contrast to issues concerning the 
defendant's
 own testimony, but the 
Flores
 court did not acknowledge the constitutional and ethical ramifications that arise when the 
defendant's
 testimony is at issue.  See 
Midgett
, 342 F.3d at 326 (citing a defendant's sixth amendment right to assistance of counsel and constitutional right to testify on his own behalf as implicated when client-perjury issues arise).  Nor did the 
Flores
 court address the significant risk of unfair prejudice that results when defense counsel reveals that he believes his client will testify falsely.  See 
United States v. Long
, 857 F.2d 436, 447 (8th Cir. 1988) (noting that once defense counsel makes a motion to withdraw or allows his client to testify in the narrative, "the die is cast.  The prejudice will have occurred.  At a minimum, the trial court will know of the defendant's potential perjury").  In addition, 
Flores
 provides no guidance to trial courts and attorneys as to (1) whether or when defense counsel should bring concerns about client perjury to the trial court's attention, (2) whether or when the prosecutor should become involved, (3) whether the defendant has a right to be present when defense counsel notifies the court that he believes the defendant will commit perjury, or (4) the making of a record on these matters.   

Further, we note that no other jurisdiction has adopted Illinois' good-faith-determination standard.  Instead, our research has revealed that standards adopted by other jurisdictions include the following: (1) actual knowledge, meaning that the defendant has made an "unambiguous" statement directly to the attorney regarding the intent to commit perjury (
State v. McDowell
, 2004 WI 70 ¶43,
 681 N.W.2d 500, 513; (2) a "firm factual basis" for believing that the defendant will testify falsely (
Long
, 857 F.2d at 446; see also 
Commonwealth v. Mitchell
, 438 Mass. 535, 551-52, 781 N.E.2d 1237, 1250-51 (2003); 
State v. James
, 48 Wash. App. 353, 367, 739 P.2d 1161, 1169 (1987))
; (3) "compelling support" for the attorney's conclusion regarding what is true and what is not true (
Sanborn v. State
, 474 So. 2d 309, 313 n.2 (Fla. App. 1985)); (4) "good cause to believe the defendant's proposed testimony would be deliberately untruthful" (
State v. Hischke
, 639 N.W.2d 6, 10 (Iowa 2002)); and (5) knowledge beyond a reasonable doubt that the defendant has committed, or is going to commit, perjury (
Shockley v. State
, 565 A.2d 1373, 1379 (Del. 1989)).  Many of the decisions cited above provide insightful analysis on this issue. 

Most recently, the Supreme Court of Wisconsin adopted the stringent "actual[-]knowledge" standard.  In 
McDowell
, 2004 WI ¶43, 681 N.W.2d at 513, that court held, as follows:

"[A]n attorney may not substitute narrative questioning for the traditional question and answer format unless counsel knows that the client intends to testify falsely.  Absent the most extraordinary circumstances, such knowledge must be based on the client's expressed admission of intent to testify untruthfully." 
  

The court further explained that any such admission must be "unambiguous" and "directly made to the attorney."  
McDowell
, 2004 WI ¶43, 681 N.W.2d at 513. 

In this court's view, the actual-knowledge standard adopted by the Supreme Court of Wisconsin is too high.  Circumstances foreseeably could arise in which defense counsel has knowledge that his client intends to testify falsely even absent the client's unambiguous statement made directly to defense counsel.  Nevertheless, we believe that before defense counsel may take steps that jeopardize his client's rights to representation and to testify, defense counsel should be able to articulate some basis for the belief that his client will commit perjury apart from his assessment of the evidence.   

We find more persuasive 
Long
, 857 F.2d 436, and 
Mitchell
, 438 Mass. at 551-52, 781 N.E.2d at 1250-51, two cases that provide thoughtful analysis and adopt the "firm[-]factual[-]basis" standard.  In 
Long
, the defendant claimed that he was denied effective assistance of trial counsel when his counsel coerced him into not testifying.  The record showed that when the State rested its case, defense counsel told the trial court that (1) the defendant wanted to testify; (2) counsel advised the defendant against testifying; and (3) counsel was concerned about the defendant's testimony.  At that point, the court excused the jury, and defense counsel elaborated that his withdrawal from the case might be appropriate given what he thought the defendant might say on the witness stand.  The court then explained to the defendant that if he took the stand and counsel found his testimony to be untruthful, defense counsel would withdraw from questioning him.  Defense counsel and the defendant apparently again discussed the matter and then informed the court that the defendant had decided not to testify.  
Long
, 857 F.2d at 444.

On review, the Eighth Circuit Court of Appeals concluded that the defendant was entitled to an evidentiary hearing on his ineffective-assistance-of-counsel claim.  The court explained that based on the United States Supreme Court's reference to a defendant's "announced plans" to commit perjury in 
Whiteside
, a "clear expression of intent to commit perjury is required before an attorney can reveal client confidences."  
Long
, 857 F.2d at 445.  The 
Long
 court further explained, as follows:

"As Justice Blackmun observes [in his concurring opinion in 
Whiteside
], an attorney who acts on a belief of possible client perjury takes on the role of the fact finder, a role which perverts the structure of our adversary system.  A lawyer who judges a client's truthfulness does so without the many safeguards inherent in our adversary system.  He likely makes his decision alone, without the assistance of fellow fact finders.  He may consider too much evidence, including that which is untrustworthy.  Moreover, a jury's determination on credibility is always tempered by the requirement of proof beyond a reasonable doubt.  A lawyer, finding facts on his own, is not necessarily guided by such a high standard."  
Long
, 857 F.2d at 445.

Accordingly, the 
Long
 court held that when an attorney brings a client-perjury concern to the trial court's attention, the court should "impress upon defense counsel and the defendant that counsel must have a firm factual basis" for believing the defendant will commit perjury before refusing to present the defendant's testimony.  
Long
, 857 F.2d at 446.  The 
Long
 court further suggested that trial courts should specifically inform a defendant of the possible consequences of false testimony--namely that (1) defense counsel may reveal to the trial court what he believes to be false; (2) counsel may refrain from referring to the false testimony in closing argument; and (3) the defendant may be prosecuted for perjury.  
Long
, 857 F.2d at 446 n.8.  

In 
Mitchell
, 438 Mass. at 551-52, 781 N.E.2d at 1250-51, the Supreme Judicial Court of Massachusetts (that State's highest court) also adopted a standard requiring that the attorney act in good faith and have "a firm basis in objective fact."  In so holding, the court wrote, as follows:

"[W]hen the question of perjured testimony by a defendant arises, we require *** that the lawyer *** act in good faith and have a firm basis in objective fact.  Conjecture or speculation that the defendant intends to testify falsely are not enough.  Inconsistencies in the evidence or in the defendant's version of events are also not enough to trigger the [lawyer's obligation not to elicit false testimony], even though the inconsistencies, considered in light of the Commonwealth's proof, raise concerns in counsel's mind that the defendant is equivocating and is not an honest person.  Similarly, the existence of strong physical and forensic evidence implicating the defendant would not be sufficient.  Counsel can rely on facts made known to him, and is under no duty to conduct an independent investigation."  
Mitchell
, 438 Mass. at 551-52, 781 N.E.2d at 1250-51. 

The 
Mitchell
 court also provided the following guidance for trial courts:

"Once the matter is called to the [trial] court's attention, the judge should instruct the lawyer on how to proceed.  (In evaluating the situation, the judge will have to rely on the representations of counsel, which of necessity will be cryptic, because counsel is the one who must make the disclosure while maintaining client confidences and allowing for continued zealous advocacy at trial).  Before giving instruction, the judge is not required to hold an evidentiary hearing, to appoint an independent lawyer for the defendant, or to conduct a colloquy, although the latter may be appropriate if it appears that the defendant does not clearly understand the situation he has created."  
Mitchell
, 438 Mass. at 552, 781 N.E.2d at 1251.   

III. CONCLUSION

For the reasons stated, we reverse the trial court's judgment and remand with directions to grant defendant a new trial. 

Reversed and remanded.

KNECHT, P.J., and APPLETON, J., concur.