PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

v.                                                            No. 05-5263

PAUL DAMERON MIDGETT,
            *Defendant-Appellant.*

Appeal from the United States District Court
for the Western District of North Carolina, at Charlotte.
Graham C. Mullen, Senior District Judge.
(CR-99-181)

Argued: March 15, 2007

Decided: May 24, 2007

Before TRAXLER, KING, and GREGORY, Circuit Judges.

Affirmed in part, vacated in part, and remanded by published opinion. Judge King wrote the opinion, in which Judge Traxler and Judge Gregory joined.

## COUNSEL

**ARGUED:** Charles Robinson Brewer, Asheville, North Carolina, for Appellant. Amy Elizabeth Ray, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Asheville, North Carolina, for Appellee. **ON BRIEF:** Gretchen C. F. Shappert, United States Attorney, Charlotte, North Carolina, for Appellee.

**OPINION**

KING, Circuit Judge:

Paul Dameron Midgett appeals from his convictions, after a jury trial in the Western District of North Carolina, for the offenses of malicious damage to property used in interstate commerce resulting in personal injury (and aiding and abetting the same), in violation of 18 U.S.C. §§ 844(i) and 2 ("Count I"); bank robbery by force or violence (and aiding and abetting the same), in contravention of 18 U.S.C. §§ 2113(a) and 2 ("Count II"); and putting in jeopardy the life of another by use of a dangerous weapon or device in committing a bank robbery by force or violence, in violation of 18 U.S.C. § 2113(d) ("Count III"). Midgett also appeals his resulting sentences of 360 months' imprisonment on Count I and life imprisonment on each of Counts II and III. With regard to his convictions, Midgett contends that the district court committed multiple errors justifying reversal: (1) denying his pretrial request to plead guilty to Count II; (2) denying his motion for judgment of acquittal on Count III; (3) allowing him to be placed in leg restraints during his trial; (4) denying his request for injections of the painkiller Nubain; (5) excluding from evidence an exculpatory letter purportedly written to Midgett by his co-conspirator and onetime girlfriend Theresa Russell, and limiting the use of other letters also purportedly written by Russell; (6) limiting defense counsel's direct examination of Midgett; (7) limiting defense counsel's cross-examination of Russell; and (8) acting out of bias against Midgett. With regard to his sentences, Midgett maintains on appeal that the court (1) erred in declining to continue his sentencing hearing; (2) contravened his constitutional rights in enhancing his sentences on Counts II and III based on his prior convictions; and (3) erred in imposing separate sentences on Counts II and III. As explained below, we reject each of Midgett's challenges to his convictions, as well as his first and second contentions of error relating to sentencing. The prosecution has conceded, however, that the court erred in imposing separate sentences on Counts II and III, and we vacate Midgett's sentence with regard to Count II and remand for the correction of that error.

## I.

## A.

Around 12:30 on the afternoon of October 19, 1999, J.W. Shaw, a construction worker, was sitting in a van eating lunch at his work-site in Charlotte, North Carolina, when another van pulled up on his driver's side.[1] Defendant Paul Midgett was the driver of this second van, and his girlfriend, Theresa Russell, was a passenger. Midgett emerged from his van, walked over to Shaw, doused Shaw with gasoline from a large fast-food drink cup, and demanded that Shaw hand over his wallet. Shaw complied with this demand, but Midgett nonetheless proceeded to ignite the gasoline, setting Shaw on fire. Shaw suffered burns that caused him to be hospitalized and miss between six and seven weeks of work.

After fleeing the scene of the attack on Shaw, Midgett and Russell decided to rob a bank. They stopped at a gas station and filled an empty Dr. Pepper soda bottle with gasoline. Midgett and Russell then drove to a BB&T bank branch in Indian Trail, North Carolina. Midgett told Russell that he planned to enter the bank, demand money from a teller, and, if his demand was refused, douse the teller with gasoline and ignite it. Midgett then walked into the bank carrying the bottle of gasoline in his hand and a cigarette lighter on his person. Shelby Helms, a teller, observed Midgett enter the bank and immediately suspected that the bottle in his hand was a dangerous weapon, perhaps a bomb, because of the appearance of the liquid inside and the "strange" manner in which Midgett was carrying it. J.A. 525.[2] Based on this suspicion, Helms activated the bank's silent alarm. Midgett then approached Helms's teller window and handed her a note that said something like, "Bitch, give me all your money. 50s, 100s, 10s." *Id.* at 352. Midgett's note also threatened Helms regarding the consequences she would suffer if she refused his demand, including "something about being set on fire." *Id.* at 576. After Helms

---

[1]The factual predicate for Midgett's convictions is drawn from the trial record, and is spelled out in the light most favorable to the prosecution. *See United States v. Ryan-Webster*, 353 F.3d 353, 359 (4th Cir. 2003).

[2]Citations herein to "J.A. ___" refer to the contents of the Joint Appendix filed by the parties in this appeal.

received the note, she handed Midgett approximately $3,000 in cash, and Midgett thereupon left the bank. Police officers apprehended Midgett and Russell several hours later.

### B.

On November 3, 1999, Midgett was indicted by a federal grand jury in North Carolina's western district on Counts I, II, and III (the "Indictment"). Subsequently, on November 29, 1999, the Government filed an information giving notice that, if Midgett was convicted, it would seek to have his sentence enhanced based on two of his prior convictions: a 1985 state conviction for robbery with a dangerous weapon and a 1993 federal conviction for bank robbery. *See* 18 U.S.C. § 3559(c) (mandating life imprisonment for serious violent felony conviction if defendant has two previous such convictions). Midgett's case proceeded to trial on November 7, 2000, and the next day the jury found him guilty on all three counts. Midgett subsequently appealed and, on September 4, 2003, we vacated his convictions and remanded for a new trial because of a constitutional error unrelated to Midgett's present appeal. *See United States v. Midgett*, 342 F.3d 321, 322 (4th Cir. 2003).

### C.

On April 5, 2004, during a pretrial hearing conducted in preparation for his retrial, Midgett sought to plead guilty to Count II — bank robbery by force or violence. The court refused, however, to accept Midgett's offer to plead guilty to this single count of the Indictment. In so ruling, the court reasoned that Count II was a lesser included offense of Count III — putting in jeopardy the life of another by use of a dangerous weapon in committing a bank robbery by force or violence — and that the Government should have the opportunity to prove the greater offense.

On May 28, 2004, in another pretrial hearing, Midgett objected to the plan of the United States Marshals Service to place him in leg restraints during trial proceedings, for reasons of courtroom security. The district court replied that it would take precautions to prevent the jury from seeing Midgett's restraints, including bringing Midgett to and from the courtroom and the witness stand only when the jury was

absent. When Midgett nonetheless insisted that he be allowed to attend the proceedings unrestrained, the court responded that it would defer to the recommendation of the Marshals Service on whether to fulfill Midgett's demand. Ultimately, Midgett was placed in leg shackles during trial, but these restraints were concealed from the jury.

On June 8, 2004, shortly before his second trial commenced, Midgett filed a motion seeking injections of a painkiller called Nubain. In this motion, Midgett asserted that he suffered severe pain from Dupuytren's disease, an abnormal thickening of the subcutaneous tissue in his left palm. Midgett maintained that he had received Nubain to control this pain while he was previously incarcerated in a federal correctional facility in Atlanta, but had been administered no Nubain since his transfer to the Charlotte area for trial. As a result, Midgett contended, his pain was so great that he could not concentrate on his defense or effectively assist his counsel. Midgett thus moved the court to order that he receive Nubain injections in order to ensure his competency to stand trial (the "Nubain motion").

On the same day that Midgett filed the Nubain motion, the district court tentatively denied it pending further investigation. The court provided several reasons for its ruling in this regard. First, the court observed that Dupuytren's disease rarely causes pain. Second, Midgett's attending physician, Dr. Waite, advised that Midgett had neither complained of pain nor demonstrated observable signs thereof, and recommended that Midgett not be prescribed Nubain. Third, contrary to Midgett's assertion, his medical records indicated that he had not received Nubain while incarcerated in Atlanta. And, fourth, Midgett had a history of drug addiction, making it imprudent to provide him with Nubain — a potent and highly addictive narcotic — based only on his insistence that he needed such medication.

On June 14, 2004, Midgett moved the district court to reconsider its denial of the Nubain motion. Midgett supplemented this motion with an affidavit in which he asserted that he had, in fact, received regular Nubain injections at the federal prison in Atlanta, and that the medical records to the contrary were inaccurate. On June 16, 2004, at the beginning of Midgett's trial, the court directed the Marshals Service to further investigate his claim that he had been treated with

Nubain in the past while in federal custody. The Marshals Service did so, and discovered that Midgett could not have received Nubain in Atlanta, as he claimed, because that drug was not stocked by the Bureau of Prisons pharmacy and thus was unavailable for administration in federal correctional facilities. Furthermore, the Marshals Service informed the court that it had consulted an orthopedic specialist who advised that Dupuytren's disease did not cause pain. Acting on this information, the court denied Midgett's motion for reconsideration of its ruling on the Nubain motion.

D.

On June 14, 2004, the first day of Midgett's second trial, the Government called Theresa Russell, Midgett's co-conspirator and former girlfriend, as a witness. Midgett's lawyer conducted a lengthy cross-examination of Russell, during which the court several times directed him to avoid repetitive and unfocused questioning and to wrap up his examination within a certain period of time (five minutes on one occasion, then thirty minutes in a subsequent warning, and then ten minutes in yet a third warning). Following these admonitions, the court invoked Rule 611(a)'s mandate that it exercise reasonable control over the interrogation of witnesses, and halted the cross-examination. Thereafter, however, the court allowed Midgett's lawyer to conduct recross-examination of Russell until he had asked all the questions he wished.

The next day, June 15, 2004, after calling several other witnesses, the Government rested its case against Midgett. On the following morning, before he began to present his case-in-chief, Midgett moved for judgment of acquittal on Count III — putting in jeopardy the life of another by use of a dangerous weapon or device in committing a bank robbery by force or violence. He maintained that because there was no evidence he had brandished the bottle or explicitly threatened to attack Helms with it, he had not "used" it in committing the bank robbery. The Government responded that the act of carrying a visibly dangerous weapon while demanding money from a bank teller amounted to using the weapon during a bank robbery, and that, accordingly, no explicit threat was necessary to commit the offense alleged in Count III. After considering the parties' respective positions, the court denied Midgett's motion for judgment of acquittal.

On the afternoon of June 16, 2004, when court resumed after a recess for lunch, Midgett sought to admit into evidence a series of letters purportedly written to him by Russell (the "Russell letters"). Some of these letters contained statements tending to exculpate Midgett, and he offered them as substantive evidence to prove the truth of the matters that they asserted. The court ruled, however, that they were hearsay, and thus admissible only as extrinsic evidence of prior inconsistent statements by Russell — not as substantive evidence.

In addition, the court excluded one of the Russell letters altogether. Labelled as Defendant's Exhibit 2, this letter was a photocopy of an original document that Midgett could not produce, and featured handwriting and a signature that appeared dissimilar to those in the other Russell letters. Russell, in her trial testimony, denied having written this suspect correspondence. Significantly, the excluded letter was dated shortly after another letter in which Russell had promised Midgett that she would "say what you want me to say" on his behalf if he would send her money. J.A. 1270. Moreover, it gave an account of the burning of Shaw that was inconsistent with the version of events spelled out in the other Russell letters. After hearing argument from the parties regarding these facts, the court ruled that Defendant's Exhibit 2 should be excluded under Rule 403 because of its doubtful probative value and genuineness.

Later on the afternoon of June 16, 2004, Midgett himself took the stand. During an extensive direct examination, Midgett explained his version of the events of October 19, 1999. Once that aspect of the direct examination was concluded, Midgett's lawyer began to question him about statements Russell had made during their romantic relationship regarding her past criminal activities. The prosecution objected to this line of questioning, and the court, though overruling the objection, asked Midgett's lawyer how much time he needed to complete his examination of Midgett. Defense counsel responded, "Not a great deal, Your Honor." J.A. 774. Having thus been informed that defense counsel was nearly finished questioning Midgett, the court replied "Five minutes tops." *Id.* Shortly thereafter, the court advised Midgett's lawyer that he had two minutes remaining for direct examination. The defense lawyer did not ask for additional time. Rather, he asked his client an open-ended final question: "Is there anything that I have failed to ask you that you want to tell the

jury in regard to what happened in regard to the matters that you are now standing charged with?" *Id.* at 778. Midgett responded briefly, and the direct examination then concluded.

On June 17, 2004, the trial's fourth day, Midgett rested his case and renewed his motion for judgment of acquittal on Count III. The court again denied the motion. The charges were then delivered to the jury, which, after deliberating for approximately fifty minutes, returned a verdict of guilty on all three counts of the Indictment. The following week, on June 24, 2004, Midgett submitted a post-trial renewal of his motion for judgment of acquittal on Count III, which the court denied by its Order of July 29, 2004.

E.

Pending his sentencing, Midgett was held in a federal prison facility in Atlanta, Georgia. The court authorized Midgett's lawyer to travel to Atlanta to consult with him, at court expense, each time such authorization was requested. Midgett found this arrangement unsatisfactory, however, and on October 20, 2004, he moved that he be transferred to a facility within the Western District of North Carolina, so that he could be more readily available for meetings with his counsel. On October 22, 2004, the district court filed an Order denying Midgett's request, explaining that it "does not control the custody of prisoners and cannot grant Defendant's motion." J.A. 940. This Order went on to advise, though, that the court would forward Midgett's request to the Marshals Service, which was responsible for Midgett's housing while he awaited sentencing.

Nearly six months later, on April 11, 2005, and again on May 26, 2005, Midgett's lawyer wrote to Kelly Nesbit, then Acting United States Marshal in the Western District of North Carolina, requesting that Midgett be transferred from Atlanta to a facility in the Western District. Midgett's counsel acknowledged that the district court had given him liberal authorization to travel to Atlanta to meet with his client, but nonetheless maintained that the distance between him and Midgett had left him unable to prepare adequately for Midgett's sentencing. Marshal Nesbit, in his replies of April 19, 2005, and June 8, 2005, informed Midgett's lawyer that the Marshals Service was "not in a position to secure housing for Mr. Midgett within the Western

District of North Carolina," primarily because "[t]he local contract facilities refuse to house Mr. Midgett for any extended time frame due to his documented history of assault on staff and other inmates." J.A. 1048, 1052.

On May 25, 2005, the district court scheduled Midgett's sentencing hearing for June 22, 2005. On June 2, 2005, Midgett moved to continue the hearing until a later date, complaining that his incarceration in Atlanta had left him and his counsel unable to properly prepare for the proceeding. That same day, the court granted the requested continuance. Subsequently, on September 16, 2005, Midgett's sentencing hearing was rescheduled for November 8, 2005. On October 10, 2005, Midgett moved the court for another continuance of the hearing, asserting that a witness he had subpoenaed would be unavailable on the scheduled hearing date. Four days later, on October 14, 2005, the court granted an additional continuance, rescheduling Midgett's sentencing hearing for December 2, 2005. Then, on November 30, 2005 (more than seventeen months after he had been found guilty), Midgett moved the court to continue his sentencing hearing once again, maintaining that he was yet unprepared for sentencing due to the circumstances of his incarceration in Atlanta. The next day, December 1, 2005, the court denied Midgett's motion.

On December 2, 2005, the district court conducted Midgett's sentencing hearing. At the beginning of the hearing, Midgett again moved that his sentencing be continued, asserting that Atlanta prison officials had prevented him from bringing certain handwritten legal notes to his hearing in Charlotte. These notes, according to Midgett, included a list of questions he wanted his counsel to ask during the sentencing proceeding. Present in the courtroom was a Deputy Marshal who had accompanied Midgett from Atlanta to Charlotte, and the court asked him about Midgett's allegation that he had been deprived of his legal papers. The Deputy Marshal responded that the prison official overseeing Midgett's departure from Atlanta had, in fact, specifically instructed Midgett to bring all of his legal materials with him as he left his cell.

The court decided to contact prison officials in Atlanta, to request that they retrieve the missing papers from Midgett's cell and fax them to the federal courthouse in Charlotte. The court also elected to allow

Midgett and his counsel to meet for approximately two hours, so they could discuss the proposed questions that Midgett claimed he had been forced to leave in Atlanta. In order to facilitate these decisions, the court recessed the sentencing proceeding until 1:00 that afternoon.

Upon reconvening court at 1:00 p.m., the trial judge, in open court, telephoned Joe Brookshire, the Bureau of Prisons movement coordinator in Atlanta. In response to the court's questioning, Brookshire asserted that he had instructed Midgett to bring "all of his pertinent legal material" as he left his cell. Brookshire also advised the court that, earlier that morning, in response to the court's request, he had inspected Midgett's cell looking for handwritten legal notes, and had faxed all such materials that he discovered to the court in Charlotte.

After the district court had finished its questioning of Brookshire, Midgett's counsel advised the court that the notes faxed from Atlanta were not the materials Midgett had prepared for his sentencing, and that Midgett had been unable to replicate the purportedly missing materials from memory during the recess. On that basis, defense counsel again sought for the sentencing hearing to be continued. The court, however, denied the motion for a continuance and moved forward with Midgett's sentencing.

Turning to the substance of his sentencing, Midgett objected to the Presentence Report's finding that he was subject to mandatory life imprisonment, pursuant to 18 U.S.C. § 3559(c), because he had two prior convictions for serious violent felonies. Specifically, Midgett asserted that he was entitled, under the Sixth Amendment, to a jury trial on whether he possessed prior convictions sufficient to subject him to enhanced sentencing under § 3559(c). The sentencing court rejected Midgett's contention in this regard. Midgett offered no further objections, and the court sentenced him to 360 months' imprisonment on Count I and life imprisonment on each of Counts II and III, all to be served concurrently.

Midgett has timely appealed his convictions and sentences, and we possess jurisdiction under 28 U.S.C. § 1291.

II.

We review for abuse of discretion a district court's rejection of a guilty plea, *see Santobello v. New York*, 404 U.S. 257, 262 (1971) ("A

court may reject a plea in exercise of sound judicial discretion."), its denial of a motion for a continuance, *see Morris v. Slappy*, 461 U.S. 1, 11-12 (1983), its decision to require a defendant to wear restraints during trial, *see Billups v. Garrison*, 718 F.2d 665, 667 (4th Cir. 1983), its rulings on the admissibility of evidence, *see United States v. Queen*, 132 F.3d 991, 993 (4th Cir. 1997), and its decision to limit the duration of a witness's testimony, *see United States v. Turner*, 198 F.3d 425, 429 (4th Cir. 1999). A district court's denial of a motion for judgment of acquittal is reviewed de novo, viewing the evidence in the light most favorable to the prosecution. *See United States v. Ryan-Webster*, 353 F.3d 353, 359 (4th Cir. 2003). We also review de novo the legal conclusions underlying a sentence imposed by a district court. *See United States v. Moreland*, 437 F.3d 424, 433 (4th Cir. 2006). Finally, we are obliged to affirm a district court's finding of fact that a defendant is competent to stand trial unless that finding is clearly erroneous. *See United States v. Robinson*, 404 F.3d 850, 856 (4th Cir. 2005).

III.

Midgett has made numerous assignments of error, and we find it helpful, for purposes of clarity, to address them in a somewhat different order than that presented in his brief. First, we will assess Midgett's various challenges to the district court's case-management decisions. We will then consider Midgett's assertion that the court should have granted judgment of acquittal on Count III, and conclude by evaluating his contentions regarding sentencing.

A.

1.

Midgett first contends that the district court erred in declining his offer to plead guilty to Count II, bank robbery by force or violence. Midgett acknowledges that Count II is a lesser included offense of Count III, putting in jeopardy the life of another by use of a dangerous weapon or device in committing a bank robbery by force or violence. He nonetheless maintains that the court was obliged to accept his plea to the lesser included offense of Count III, in effect allowing him to unilaterally arrange his own plea bargain.

Midgett's contention in this regard is squarely foreclosed by controlling precedent. In *United States v. Canty*, we considered and rejected the specific proposition advanced by Midgett, concluding that "in the absence of an agreement by the Government, the refusal to accept a plea to a lesser charge is not an abuse of discretion." 422 F.2d 358, 359 (4th Cir. 1970). Accordingly, the district court committed no error in declining to accept Midgett's plea of guilty to Count II.

2.

Midgett next contends that the district court erred in denying his request not to be placed in leg restraints during trial. As explained above, the court took precautions to ensure that the jury would not discover that Midgett was wearing leg shackles. Midgett maintains, however, that he desired to leave the witness stand during his testimony to point to exhibits displayed on the courtroom projector screen, but could not do so for fear of revealing his restraints to the jury. On the basis of this asserted prejudice, Midgett claims that the court's decision concerning his restraints constituted an abuse of discretion.

Our decisions make clear, however, that in determining whether a defendant should be placed in restraints during trial, a court has broad discretion to balance the "accused's right to the indicia of innocence before the jury" against "the competing rights of participants in the courtroom and society at large." *Billups v. Garrison*, 718 F.2d 665, 668 (4th Cir. 1983) (quoting *United States v. Samuel*, 431 F.2d 610, 615 (4th Cir. 1970)). In this matter, the court relied on the judgment of the Marshals Service that Midgett should remain in leg restraints for reasons of courtroom security, and took care to avoid prejudice to Midgett by concealing this safety measure from the jury. Moreover, the trial record reveals that Midgett failed to advise the court of why he needed to leave the witness stand and approach the projector screen in order to testify effectively — nor has Midgett offered any such explanation on appeal. In these circumstances, we can only conclude that the court reasonably balanced the competing interests implicated by Midgett's motion to have his restraints removed, and did not abuse its discretion in that regard.

3.

Midgett also maintains that the district court erred in declining to order that he receive injections of the painkiller Nubain. Midgett's brief in this appeal fails to identify a specific constitutional or legal principle that the court contravened in declining to provide him with painkillers. He refers, however, to authority relating to the due process right against being tried while incompetent, *see Pate v. Robinson*, 383 U.S. 375 (1966), and so we construe his contention in this regard as a claim that his Dupuytren's disease caused pain so severe that he was rendered incompetent to stand trial. Even with the benefit of that generous construction, Midgett's contention on this point is entirely meritless.

In making his Nubain motion, Midgett offered two grounds for his assertion that he needed pain medication. First, he maintained that he suffered from Dupuytren's disease, and that this condition caused him such pain that he could not properly concentrate on his defense. Second, he advised the court that he had received Nubain injections while incarcerated in Atlanta, and that the discontinuance of this treatment following his pretrial transfer to the Gaston County Jail was the reason for his excessive pain. Upon investigation, however, the court learned that Dupuytren's disease is not a painful condition; that Midgett's medical records showed he had not received Nubain while incarcerated; that, indeed, he could not have been treated with Nubain while in federal custody because the Bureau of Prisons' pharmacy does not stock that medication; and that his doctor advised against treating him with Nubain. With Midgett's claims thus debunked, the court had no basis on which to grant his motion.

Essentially, then, Midgett contends that a trial court is obliged to provide potent painkillers to a defendant merely because he demands them — even if the proffered reasons for the demand prove to be false, and even if the defendant has a history of serious drug addiction. We must reject this untenable proposition. The district court committed no error in allowing Midgett's trial to proceed without ordering that he receive Nubain injections.

4.

Midgett next contends that the district court erred in limiting his use of the Russell letters to impeachment only, as well as in excluding

one of those letters — Defendant's Exhibit 2 — from evidence. At trial, the court ruled that the Russell letters were hearsay and thus inadmissible to prove the truth of the matters asserted therein. The court also concluded that Defendant's Exhibit 2, a letter purportedly written by Russell to Midgett but that Russell denied authoring, should be excluded under Rule 403 because its probative value was substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. Midgett challenges both of these determinations, but fails to offer any explanation — beyond his bare assertions of error — of why the court's rulings on the Russell letters abused its discretion.

The Russell letters, to the extent they were offered to prove the matters that they asserted, were hearsay within the meaning of Rule 801 and thus inadmissible pursuant to Rule 802. The court thus was correct to admit them only as extrinsic evidence of Russell's prior inconsistent statements pursuant to Rule 613. With regard to Defendant's Exhibit 2, the court was faced with abundant indicia of that letter's unreliability, and consequently committed no abuse of discretion in concluding that its potential to create unfair prejudice or mislead the jury substantially outweighed its probative value. In these circumstances, we reject Midgett's contention that the court's rulings on the Russell letters were erroneous.

5.

Midgett next challenges the district court's instructions to his lawyer concerning the duration of his direct examination testimony and Russell's cross-examination testimony. He maintains that by directing his lawyer to complete these examinations within a limited period of time, and by requiring his counsel to finish questioning Russell in recross-examination, the court improperly interrupted the flow of his and Russell's testimony and signalled to the jury that this testimony was unimportant. It is well settled, however, that a trial court possesses broad discretion to control the mode of interrogation of witnesses, a principle that Midgett does not dispute. *See* Fed. R. Evid. 611(a); *United States v. Gravely*, 840 F.2d 1156, 1163 (4th Cir. 1988).

Here, the district court took care to enforce its time limits so that Midgett's lawyer was allowed to complete his questioning. Impor-

tantly, the time restrictions were announced only after lengthy interrogation had elicited each witness's central evidence and then drifted into areas of less obvious relevance. Moreover, the cross-examination of Russell was allowed to continue long after the court initially instructed Midgett's counsel to conclude it within five minutes, and, in his subsequent recross-examination, the defense lawyer was able to ask all the questions he wished. Similarly, the direct examination of Midgett was restricted only after defense counsel had advised the court that his questioning was nearly finished, and it concluded before the time limit imposed by the court had expired.

Midgett thus does not contend that the limits placed on his lawyer's questioning of witnesses denied him the opportunity to elicit or attack evidence. Nor, critically, does he point to any authority that suggests the circumstances were inappropriate for the court to exercise its discretion in limiting interrogation. Nor does he maintain that the court used improper means in doing so. Rather, he simply asserts that the court's decisions in this regard disrupted his lawyer's questioning and might have given the jury an unfavorable impression of his case. Even if his position in that regard is accurate, it does not imply that the court abused its discretion. Accordingly, we reject Midgett's contention that the court erred in limiting the duration of his direct examination and the cross-examination of Russell.

B.

In addition to his many challenges to the district court's trial management, Midgett contends that the court erred in denying his motion for judgment of acquittal on Count III. Count III charged that Midgett had contravened 18 U.S.C. § 2113(d), which prohibits putting in jeopardy the life of another by use of a dangerous weapon or device in committing a bank robbery by force or violence. Midgett acknowledges that there was sufficient evidence for the jury to find that he was openly carrying a bottle of gasoline when he demanded money from bank teller Helms, and that he was also carrying a lighter at that time. Nonetheless, he maintains that the evidence was insufficient, as a matter of law, for the jury to find that he "used" the gasoline or put Helms's life in jeopardy within the meaning of the governing statute.

The trial evidence, however, was more than adequate for the jury to make the requisite findings. Helms testified that, even before Mid-

gett approached her and handed her the robbery note, she recognized the bottle of gasoline as a dangerous device by the appearance of its contents and the way Midgett was carrying it; in fact, she became so concerned that she activated the bank's silent alarm immediately after Midgett entered the building. Midgett then came to her window and, while conspicuously carrying this recognizably dangerous device, handed her a note demanding money and threatening "something about being set on fire." J.A. 576. Given such evidence, the jury was thoroughly warranted in finding that Midgett used the bottle of gasoline in committing the bank robbery.

The jury also received evidence sufficient to sustain its finding that Midgett's use of this dangerous weapon put Helms's life in jeopardy. According to Russell's testimony, Midgett unambiguously asserted, just prior to entering the bank, that he would set the teller on fire if she refused his demand for money. In addition, the jury heard compelling evidence — the sufficiency of which Midgett does not contest — that Midgett had used gasoline to severely burn Shaw earlier on the day of the bank robbery. This evidence amply supported the jury's finding concerning the jeopardy to Helms's life posed by Midgett's bottle of gasoline. In these circumstances, the district court did not err in denying Midgett's motion for judgment of acquittal on Count III.

C.

Finally, Midgett asserts that the district court committed three errors relating to his sentencing. First, he maintains that the court should have continued his sentencing hearing of December 2, 2005. Second, he contends that, in increasing his potential sentence based on its own finding that he possessed certain prior convictions, the court contravened his Sixth Amendment rights. Third, he asserts that the court erred in imposing separate life sentences for Counts II and III because Count II was a lesser included offense of Count III. We address these contentions seriatim.

1.

The sentencing court did not abuse its discretion in declining to continue Midgett's sentencing hearing for a third time, as Midgett requested in his November 30, 2005 motion for continuance and

again in his oral motion at the beginning of his December 2, 2005 sentencing hearing. Although Midgett's incarceration in Atlanta pending sentencing required his lawyer to travel in order to meet with him, defense counsel was permitted to make that trip at court expense as often as he wanted. Moreover, the court granted Midgett's two earlier requests for continuances, and, as a result, ultimately conducted the sentencing hearing more than seventeen months after the conclusion of trial. Furthermore, when Midgett asserted at sentencing that he had been forbidden to bring some important legal papers from Atlanta, the court determined that Atlanta prison officials had, in fact, specifically instructed Midgett to take all his legal materials with him — and the court then directed those officials to fax any such papers they found in Midgett's cell to the courthouse in Charlotte. In these circumstances, we cannot conclude that the court abused its discretion in declining to continue Midgett's sentencing hearing.

2.

Midgett also maintains that the district court committed constitutional error in finding that he possessed two prior convictions for serious violent felonies, thereby increasing his maximum sentence. He maintains that, pursuant to the Sixth Amendment, such facts must be found by a jury rather than by a court. The Supreme Court, however, in *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000), concluded that a sentencing court may find the fact of a prior conviction even if its finding in that regard increases the defendant's potential sentence. Accordingly, the court did not err in sentencing Midgett based on its own findings regarding his prior convictions.[3]

---

[3]Midgett asserts that Supreme Court decisions issued since *Apprendi* have undercut the principle that a defendant's potential punishment may be enhanced based on a court-found fact of a prior conviction. He thus invites us to declare that *Apprendi*'s holding to that effect has been implicitly overruled. As we explained in *United States v. Cheek*, 415 F.3d 349, 352-53 (4th Cir. 2005), however, "we are not free to overrule or ignore the Supreme Court's precedents."

3.

Finally, we examine Midgett's contention that the district court erred in imposing separate sentences on Counts II and III. As we have already observed, Count II of the Indictment charged Midgett with bank robbery by force or violence; Count III charged him with putting in jeopardy the life of another by use of a dangerous weapon or device in committing a bank robbery by force or violence. The offense alleged in Count II was thus a lesser included offense of that alleged in Count III. *See United States v. Whitley*, 759 F.2d 327, 329 (4th Cir. 1985) (en banc) ("The en banc court, overruling circuit precedent to the contrary, holds that § 2113 creates greater and lesser included offenses."). Consequently, it was inconsistent with the Fifth Amendment's Double Jeopardy Clause for Midgett to be subject to separate sentences on those two counts. *See Rutledge v. United States*, 517 U.S. 292, 301-02 (1996); *United States v. Shorter*, 328 F.3d 167, 173 (4th Cir. 2003); *United States v. Jones*, 204 F.3d 541, 544 (4th Cir. 2000). By its letter to this Court of March 13, 2007, the prosecution conceded that the district court erred in this regard. We therefore vacate Midgett's sentence on Count II and remand for the district court to enter an amended judgment of conviction. *See id.*[4]

---

[4]Midgett also contends that the rulings challenged in this appeal, taken together and considered along with certain other aspects of the trial record, demonstrate that the district court was biased against him. Having concluded that none of the individual rulings of which Midgett complains was erroneous, and having reviewed the other parts of the record to which he has directed us (as well as the additional materials he submitted on this issue following oral argument), we find no support for his assertion of bias on the part of the court. *Cf. Liteky v. United States*, 510 U.S. 540, 555 (1994) ("[O]pinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible. Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge.").

## IV.

Pursuant to the foregoing, we affirm Midgett's convictions and sentences, with the exception of his sentence on Count II, which we vacate. We remand for the entry of an amended judgment that reflects this disposition.

*AFFIRMED IN PART, VACATED*
*IN PART, AND REMANDED*