**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

---

**No. 19-4599**

---

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

  v.

DAWN J. BENNETT,

    Defendant - Appellant.

---

Appeal from the United States District Court for the District of Maryland, at Greenbelt. Paula Xinis, District Judge. (8:17-cr-00472-PX-1)

---

Argued: December 8, 2020         Decided: January 21, 2021

---

Before KING and QUATTLEBAUM, Circuit Judges, and TRAXLER, Senior Circuit Judge.

---

Affirmed by published opinion. Judge Quattlebaum wrote the opinion, in which Judge King and Judge Traxler joined.

---

**ARGUED:** Jaclyn Lee Tarlton, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Raleigh, North Carolina, for Appellant. Jennifer Lynne Wine, OFFICE OF THE UNITED STATES ATTORNEY, Greenbelt, Maryland, for Appellee. **ON BRIEF:** G. Alan DuBois, Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Raleigh, North Carolina, for Appellant. Robert K. Hur, United States Attorney, Erin B. Pulice, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Greenbelt, Maryland, for Appellee.

QUATTLEBAUM, Circuit Judge:

Following a jury trial, Dawn J. Bennett was convicted of seventeen financial crimes and sentenced to 240 months of imprisonment. She now appeals, claiming that the district court erred in denying her continuance request, imposing a criminal forfeiture judgment and issuing a procedurally and substantively unreasonable sentence. Finding no error, we affirm.

I.

For many years, Bennett was a successful investment advisor in the Washington, D.C. area. But around 2010, she began a new venture. Bennett decided to create an internet-based luxury sporting goods business—DJBennett.com. The website sold very expensive sporting good items, including "$502 fishing boots, $680 skiing hats, and $13,500 golf bags." J.A. 237. Although the website was not very profitable, Bennett's investment business continued to flourish. In 2013, however, Bennett's investment business started to decline. She then began to focus more on DJBennett.com. Those efforts included seeking financing from commercial lenders and individual investors, including her investment clients.

In order to induce individuals to invest in the website, Bennett exaggerated the business's successes and inflated sales figures and revenue projections. Bennett also offered attractive terms to her investors. She guaranteed her investors a fifteen percent rate of return, promised them that their investments would be used for business purposes and assured them that their investments were fully liquid. Additionally, she guaranteed her

investors that their investments were backed by her personal wealth. She failed to inform her investors that the website was actually unprofitable or that she was accumulating debt. In some cases, Bennett's fraudulent statements were so convincing that they led to individuals investing their entire retirement savings. Bennett repaid a small number of investors. However, the money came from other investors and commercial lenders rather than business profits. In other words, she borrowed from Peter to pay Paul.

Ultimately, Bennett convinced 46 investors to invest $20,407,034 in the website. She repaid some investors a total of $6,100,193, but not the rest. Moreover, the remaining money was largely spent on personal expenses unrelated to the website. For example, Bennett spent large sums of money on Dallas Cowboys tickets, more than $800,000 on ritual blessings performed by priests in India, $141,947 on astrological gemstone jewelry, $68,664 on anti-aging and weight loss treatments and $57,300 on dermatological treatments. This conduct forms the basis for Bennett's numerous criminal charges.

## II.

In August 2017, the government charged Bennett by criminal complaint with wire fraud, bank fraud and making false statements in relation to loan and credit applications. A short time later, a federal grand jury returned a two-count Indictment charging Bennett with bank fraud and making false statements on a loan application. Bennett was represented by various private counsel as well as the Federal Public Defender's Office following the Indictment. Then, in November 2017, a Superseding Indictment charged Bennett with conspiracy to commit securities fraud, conspiracy to commit wire fraud, securities fraud,

3

wire fraud, bank fraud, and making false statements on a loan application. All told, Bennett was named in seventeen counts in the Superseding Indictment, which included a forfeiture allegation seeking "at least $14,169,754." J.A. 84.

After Bennett was arraigned on the Superseding Indictment, the government asked for a continuance, which Bennett opposed. At a January 2, 2018 hearing, Bennett again asked for an earlier trial date due to her pretrial detention. The district court considered the complexity of the case, a co-defendant's request for a later trial date and the prejudice to the government, ultimately scheduling jury selection for September 4, 2018. On May 30, 2018, Bennett's then-retained counsel withdrew from the case and the Federal Public Defender was again appointed to represent Bennett. As a result, the district court moved the trial date to October 2, 2018.

On August 8, 2018, Bennett requested another continuance due to health issues and problems with her attorney. During the hearing on Bennett's request, the district court outlined the accommodations it had made for Bennett to be prepared for trial, including allowing her to review discovery at the courthouse two days a week for six hours each day and ordering the government to produce a variety of evidence and "hot docs" on a rolling basis. In denying the motion, the district court found that Bennett had "chosen not to participate [in her defense] and chosen to make issues that thwart her cooperation with [defense counsel] and the orderly progression of this case." S.J.A. 162.

On August 28, 2018, yet another retained attorney ("Trial Counsel") appeared on behalf of Bennett. The following day, he filed a motion to continue the trial. The motion claimed that Bennett had difficulty retaining counsel of her choosing "because of her

4

incarceration and the freezing of her assets." J.A. 91. It also indicated that there were several important issues that Trial Counsel needed to investigate prior to proceeding to trial, including retaining experts on the valuation of Bennett's business and locating and interviewing exculpatory witnesses. The government opposed the motion, noting that Trial Counsel was the "tenth counsel to enter an appearance" on her behalf. J.A. 98. Furthermore, the government argued "[a]ll of the 'remaining work' is work that could have been done, and likely was done, by prior counsel." J.A. 98.

At the August 30, 2018 hearing on the motion to continue, the district court formally relieved the Federal Public Defender's Office as counsel for Bennett. Prior to doing so, the district court asked Trial Counsel, "if I deny your motion to continue, what will you be doing in this case?" J.A. 102. A discussion about Trial Counsel's ability to prepare ensued. The district court then offered to assist Trial Counsel in obtaining discovery, but he responded, "I would tell you that discovery is not a problem, and we can review the discovery and be prepared." J.A. 117.

After analyzing Bennett's arguments and the government's opposition, the district court denied the motion to continue. The district court noted that moving the trial date would allow a defendant with financial means to upset the administration of justice by claiming to locate money right before trial, hiring new counsel and then having the newly hired counsel claim they cannot be ready for the previously scheduled trial.

Shortly thereafter, Trial Counsel filed another motion to continue, this time based on Bennett's need for medical treatment. At a September 13, 2018 pretrial conference, the district court addressed the motion. It found that "it would be fundamentally unfair to

5

continue the trial, especially in light of the fact that the only new medical information that [it had been provided was] about a concerning lump but one that even the medical providers have noted as benign." J.A. 130. The court acknowledged that Bennett needed to receive follow-up medical treatment, including an MRI, but found that she would have access to that care prior to trial.

The case proceeded to trial where the jury convicted Bennett of all seventeen counts. The government later moved for a preliminary order of forfeiture seeking $14,306,842, reflecting the net amount of investments Bennett received minus the amount repaid to the victims. Bennett opposed the request, claiming that the government failed to adequately establish the amount of the forfeiture money judgment. But at the hearing on the preliminary order of forfeiture, Bennett did not object to the proposed preliminary order of forfeiture. The district court entered a preliminary order of forfeiture in the amount of $14,306,842.

Several months later, the government moved to amend that preliminary order to include specific property to partially satisfy the money judgment. The total monetary amount of the requested forfeiture did not change. Bennett opposed the motion, claiming that "[t]o the extent that the government's seizure of Ms. Bennett's untainted assets in January was made pursuant to 18 U.S.C. § 853(e),[1] or an analogous statutory provision, such seizure exceeded its statutory authority." J.A. 1907 (citation omitted). The district

---

[1] It appears this is a scrivener's error and should refer to 21 U.S.C. § 853(e), which outlines the property subject to criminal forfeitures.

court granted the government's motion, holding that the requested amount reflected the "proceeds of the violation." J.A. 49, 1934.

The district court then sentenced Bennett. At her sentencing hearing, the district court determined that her advisory sentencing guidelines range was 324 to 405 months of imprisonment. The government recommended a below-guidelines sentence of twenty-five years of imprisonment. Bennett recommended three years. The district court, after evaluating the relevant statutory sentencing factors, sentenced Bennett to 240 months of imprisonment followed by five years of supervised release. It declined to impose a fine, finding "absolutely no justice in a fine when the money can otherwise go to the victim[s]." J.A. 2127. The court then finalized the preliminary order of forfeiture without objection from Bennett. And it imposed restitution in the amount of $14,504,290 making the entire restitution amount payable immediately so that the government could apply the forfeited assets to the restitution.[2] Bennett filed a timely notice of appeal.

III.

Bennett raises three issues in this appeal. First, she contends the district court erred by denying her August 29, 2018 continuance motion. Second, she argues the criminal forfeiture order is legally deficient and unconstitutionally excessive. Finally, she contends that her sentence is procedurally and substantively unreasonable. We address these in turn.

_____

[2] The government notes in its brief that Bennett's "restitution judgment was slightly more than her forfeiture money judgment because the forfeiture amount was net of amounts repaid to certain investors." Appellee's Br. at 19 n.7.

A.

Bennett first argues that the district court erred in denying the August 29, 2018 continuance motion.[3] Specifically, she contends the denial of the continuance request forced Trial Counsel to proceed to trial without adequate preparation.

"We review the denial of a motion for a continuance for abuse of discretion." *United States v. Copeland*, 707 F.3d 522, 531 (4th Cir. 2013) (citing *United States v. Midgett*, 488 F.3d 288, 297 (4th Cir. 2007)). "A district court abuses its discretion when its denial of a motion for continuance is 'an unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay.'" *Id.* (quoting *Morris v. Slappy*, 461 U.S. 1, 11–12 (1983)).

To assess Bennett's arguments, we begin with the reasons the district court denied the motion to continue. It explained:

> Given that this case has been pending in some form or another since August [2017], finding the kind of block that we need to do this right from all counsel involved, and [Trial Counsel is], indeed, if not the tenth, close to the tenth defense attorney who has entered his or her appearance in this case, I simply cannot move this trial. To move it would basically allow counsel – defendant with resources to find the resources close in time to trial, have that counsel say to me I can't be ready or I can be ready but I really would wish to be ready later, and then the orderly administration of the case is upset.
> Ms. Bennett now has her counsel of choice, and her counsel of choice is of a firm with enough resources and with the able and competent assistance of your client to be ready.

J.A. 116.

---

[3] Bennett has not argued that the district court erred in denying Trial Counsel's second continuance motion, which was based on Bennett's need for medical treatment.

From our review of the record, the district court's decision was neither unreasonable nor arbitrary. This was not Bennett's first change of counsel. In fact, she changed counsel multiple times, frequently switching between retained counsel and the Federal Public Defender's Office. Noting Bennett's revolving door of attorneys, the district court explained that it would be unfair to the government and the court to undo a trial schedule set after carefully considering the schedules of all involved in setting the date simply because Bennett made another change in her legal team.

Importantly, when Bennett sought to replace the Federal Public Defender with Trial Counsel late in the case, the district court addressed the very concerns Bennett now raises. Before releasing the Federal Public Defender, the court communicated its expectations of a trial date and offered to assist Bennett and Trial Counsel in preparing for trial. In fact, the district court inquired about his ability to be prepared for trial and in particular to review the voluminous discovery in the case. Trial Counsel responded that he would be ready by unequivocally stating, "I would tell you that discovery is not a problem, and we can review the discovery and be prepared." J.A. 117. Against this record, we conclude that the district court acted well within its discretion in denying Bennett's continuance request

B.

Bennett next challenges the $14,306,842 criminal forfeiture order. She contends the order should be vacated for three reasons: (1) there is no statutory basis for the forfeiture; (2) the forfeiture judgment improperly interferes with her ability to pay restitution in violation of 18 U.S.C. § 3572; and (3) the forfeiture judgment is unconstitutionally excessive in violation of the Eighth Amendment.

9

Prior to addressing the merits of Bennett's arguments, however, we must determine whether the arguments are preserved or whether plain error review applies. While Bennett raised an argument below as to the amount of the criminal forfeiture, she did not raise any of the three arguments now advanced on appeal. Therefore, plain error review applies to these issues. *See United States v. Robinson*, 460 F.3d 550, 557 (4th Cir. 2006) ("If an appellant failed to timely object to an alleged error . . . we are obliged to apply the 'plain error' standard set forth in Rule 52(b)." (citing *United States v. Olano*, 507 U.S. 725, 731 (1993))).

To succeed under plain-error review, Bennett bears the burden to show that: (1) an error occurred; (2) the error was plain; and (3) the error affected her substantial rights. *Olano*, 507 U.S. at 732; *United States v. Knight*, 606 F.3d 171, 177 (4th Cir. 2010). Finally, if the first three prongs are met, we will only exercise our discretion to correct the error if it "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *Olano*, 507 U.S. at 732. The Supreme Court has cautioned that "[m]eeting all four prongs is difficult, as it should be." *Puckett v. United States*, 556 U.S. 129, 135 (2009) (internal quotation marks omitted).

1.

With that exacting standard in mind, we consider Bennett's first argument that there is no statutory basis for the criminal forfeiture. Bennett's explanation of this issue has evolved. After not raising it below, her opening brief argued that 18 U.S.C. § 371, the general conspiracy statute, does not independently authorize criminal forfeiture. In her reply brief, however, she elaborated that a generic conspiracy where the underlying offense

10

is 15 U.S.C. § 78j(b) securities fraud cannot support a criminal forfeiture judgment. To that end, Bennett relies on a variety of interlocking federal statutes to attempt to demonstrate this point. But even assuming, without deciding, that the district court committed plain error, such error did not affect Bennett's substantive rights. As she conceded at oral argument, wire fraud forms a permissible statutory basis for criminal forfeiture. Indeed, the Superseding Indictment specifically contains a forfeiture allegation as to the wire fraud counts, which seeks "at least $14,169,754 in United States currency and all interest and proceeds traceable thereto . . . ." J.A. 83–84. Therefore, any error regarding the securities fraud counts did not affect Bennett's substantial rights. *See Robinson*, 460 F.3d at 557.

2.

Bennett next argues that the district court erred in failing to analyze her ability to pay the forfeiture judgment in addition to the restitution judgment. Bennett's argument relies on the language of 18 U.S.C. § 3572(b), which states: "If, as a result of a conviction, the defendant has the obligation to make restitution to a victim of the offense, other than the United States, the court shall impose a fine or other monetary penalty only to the extent that such fine or penalty will not impair the ability of the defendant to make restitution." Essentially, Bennett argues that the phrase "other monetary penalty" in § 3572(b) includes criminal forfeiture judgments. Thus, she claims, the forfeiture order will prevent her from satisfying her restitution obligations.

While we have not addressed this specific issue, we have held that "[f]orfeiture is mandatory even when restitution is also imposed" because "[t]hese two aspects of a defendant's sentence serve distinct purposes: restitution functions to compensate the

11

victim, whereas forfeiture acts to punish the wrongdoer." *United States v. Blackman*, 746 F.3d 137, 143 (4th Cir. 2014). Additionally, "the government has the discretion to use forfeited assets to restore a victim whom the defendant has failed to compensate." *Id.*

Relevant here, the government represented in both the district court and its briefing to us that it intends to apply the forfeited assets to the restitution judgment. We accept this representation that it will fulfill its discretionary statutory authority to help make the victims of Bennett's criminal scheme whole. *See* 18 U.S.C. § 981(e)(6) (authorizing the Attorney General to transfer forfeited property "as restoration to any victim of the offense giving rise to the forfeiture"). Such an approach would assist rather than impede the fulfillment of the restitution sentence.

The government also provides practical, as well as legal, justification for seeking both forfeiture and restitution. Bennett's Presentence Report indicated that the current balances of Bennett's bank accounts "appear to be nominal." J.A. 2260. However, after the district court entered a Preliminary Order of Forfeiture, the government was able to conduct discovery and identify substantial substitute assets that could be used "to satisfy the previously-entered money judgment." J.A. 1870. As we noted in *Blackman*, "[r]ealistically, a victim's hope of getting paid may rest on the government's superior ability to collect and liquidate a defendant's assets." *Blackman*, 746 F.3d at 143. Where, as here, a duly convicted defendant has substantial substitute assets that can be used to satisfy a monetary judgment, forfeiture is often the only means by which the victims can be made whole.

For all of these reasons, we find no plain error.

3.

Last, Bennett argues the criminal forfeiture is unconstitutionally excessive under the Eighth Amendment. Specifically, Bennett argues that the district court "never conducted the required proportionality analysis to determine whether a criminal forfeiture judgment of $14 million was, in fact, grossly disproportionate to Ms. Bennett's alleged offenses because it would deprive her of her livelihood when considered in addition to a twenty-year sentence and a $14 million restitution judgment." Appellant's Br. at 32.

The Eighth Amendment provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. The Supreme Court has "explained that at the time the Constitution was adopted, 'the word fine was understood to mean a payment to a sovereign as punishment for some offense.'" *United States v. Bajakajian*, 524 U.S. 321, 327–28 (1998) (quoting *Browning-Ferris Indust. of Vt., Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 265 (1989)) (internal quotation marks omitted). "The Excessive Fines Clause thus 'limits the government's power to extract payments, whether in cash or in kind as punishment for some offense.'" *Id.* at 328 (quoting *Austin v. United States*, 509 U.S. 602, 609–10 (1993)) (internal quotation marks omitted). "Forfeitures—payments in kind—are thus 'fines' if they constitute punishment for an offense." *Id.*

"The touchstone of the constitutional inquiry under the Excessive Fines Clause is the principle of proportionality: The amount of the forfeiture must bear some relationship to the gravity of the offense that it is designed to punish." *Id.* at 334; *see also Timbs v. Indiana*, 139 S. Ct. 682, 688 (2019) (reiterating that the Excessive Fines Clause has its

13

roots in the Magna Carta, which "required that economic sanctions 'be proportioned to the wrong' and 'not be so large as to deprive [an offender] of his livelihood'") (quoting *Browning-Ferris*, 492 U.S. at 271). In order to violate the Excessive Fines Clause, a punitive forfeiture must be "grossly disproportional to the gravity of a defendant's offense." *Id.* Courts must weigh a number of factors in determining whether a forfeiture was grossly disproportional, including: (1) the amount of the forfeiture and its relationship to the authorized penalty; (2) the nature and extent of the criminal activity; (3) the relationship between the charged crime and other crimes; and (4) the harm caused by the charged crime. *United States v. Jalaram, Inc.*, 599 F.3d 347, 355–56 (4th Cir. 2010).

Following that standard, after reviewing the record here, we find no error—much less plain error. First, as the government notes, the district court could have imposed a fine of more than $28,000,000. *See* 18 U.S.C. § 3571(d) ("If any person derives pecuniary gain from the offense, or if the offense results in pecuniary loss to a person other than the defendant, the defendant may be fined not more than the greater of twice the gross gain or twice the gross loss, unless imposition of a fine under this subsection would unduly complicate or prolong the sentencing process."). Thus, the criminal forfeiture amount is half of the statutorily authorized monetary penalty. This is nowhere near the type of forfeiture the Supreme Court disapproved in *Bajakajian*, where the forfeiture amount for a reporting violation was more than seventy times the maximum permissible fine. *See* 524 U.S. at 337–38. In fact, we have affirmed a criminal forfeiture judgment of more than *twice* the authorized statutory penalty. *See United States v. Bollin*, 264 F.3d 391, 418 (4th Cir. 2001) (approving $1.2 million forfeiture judgment when the statutory maximum fine was

14

$500,000), *overruled on other grounds by United States v. Chamberlain*, 868 F.3d 290 (4th Cir. 2017) (en banc).

Second, the district court considered the nature and circumstances of Bennett's crimes. The forfeiture amount was directly derived from the amount of funds fraudulently obtained by Bennett. And the victims' impact statements and testimony demonstrate that many victims lost their life savings, had to delay retirement, had to sell their homes and were unable to pay for medical expenses and educational expenses for their children. The district court thus found that Bennett's crimes were "serious and long-running, complex and highly orchestrated, and devastating to generations of investors around the country." J.A. 2603. It further explained that Bennett's crimes were "calculating and brazen" and "as dangerous as many other conspiracies . . . whether they be financial, drug, [or] gun." J.A. 2124. Continuing, the district court stated that Bennett's conduct caused "a calculated and professional financial hit on each and every [victim]." J.A. 2124. Against this record, the district court's order of forfeiture is not excessive.

Finally, we have never expressly considered a defendant's means in evaluating the proportionality of a forfeiture judgment. However, to the extent that it is an appropriate consideration, it is merely one factor to be weighed with all other factors. Standing alone, the fact that Bennett did not have sufficient assets to satisfy the forfeiture judgment is insufficient to render the judgment unconstitutional.

For these reasons, we conclude that that the criminal forfeiture judgment is not unconstitutionally excessive.

C.

Bennett also argues that her sentence is procedurally and substantively unreasonable. Beginning with procedural unreasonableness, "[t]he Supreme Court has mandated that in reviewing any sentence, appellate courts '*must first ensure* that the district court committed no significant procedural error.'" *United States v. Provance*, 944 F.3d 213, 218 (4th Cir. 2019) (quoting *Gall v. United States*, 552 U.S. 38, 51 (2007)). "Procedural errors include failing to properly calculate the applicable Sentencing Guidelines range, failing to consider the 18 U.S.C. § 3553(a) factors, and failing to adequately explain the sentence – 'including an explanation for any deviation from the Guidelines range.'" *Id.* (quoting *Gall*, 552 U.S. at 51).

Bennett claims that the district court procedurally erred by treating the sentencing guidelines range as "presumptively reasonable." She is correct that in *Rita v. United States*, the Supreme Court held that a district court may not presume a sentence is appropriate because it falls within the guidelines. 551 U.S. 338, 351 (2007). Following the Court's guidance, we have described giving the guidelines such an effect as applying a "*Rita* presumption." *United States v. Mendoza-Mendoza*, 597 F.3d 212, 217 (4th Cir. 2010). "If a district court applies such a *Rita* presumption, its sentence is procedurally unreasonable." *Id.* at 216–17 (citing *Gall*, 552 U.S. at 50).

The question presented here is whether the district court in fact treated the guidelines as presumptively reasonable. To be sure, it stated—during a lengthy sentencing hearing—that the sentencing guidelines were "presumptively reasonable" three times. *See* J.A. 2103, 2118. And to repeat what we said in *Mendoza-Mendoza,* "[s]entencing courts are well

16

advised to avoid words like 'presumption' and 'obligation.'" 597 F.3d at 218. But there we

also clarified as follows:

> [W]hat matters on appeal is what a court actually did, not whether a remark
> here or there, removed from the larger context in which it was made, is on
> some list of forbidden phrases. If the sentencing court did what it was
> supposed to do—hearing out both sides and making an individualized
> assessment in light of § 3553(a)—then it should be protected from claims of
> having applied a *Rita* presumption.

*Id*. at 218 (citations omitted). Indeed, remand is not required "in cases where there exists

no serious possibility that the district court treated the Guidelines as presumptively

binding." *Id.* at 214.

In applying those principles here, a comparison of this case to *Mendoza-Mendoza*

is helpful. There, we vacated and remanded because the district court stated that "unless I

find a reason for a departure from those Guidelines, or a variance based on 18 U.S.C.

§ 3553, then I am obligated to pass a sentence within that Guideline range." *Id*. at 215. We

concluded such emphatic language, and particularly the district court's statement that it

was "obligated" to impose a sentence within the guidelines unless it found a reason not to,

established that there was a *Rita* presumption. *Id*. at 219.

In contrast, the record here is quite different. First, the district court did not use such

emphatic language. Instead, at the outset of its sentencing analysis, the district court

indicated its intent to vary downwards from the guidelines. Specifically, the district court

stated:

> I start with the guidelines. They are presumptively reasonable. They are
> incredibly high in this case. An offense level 41 triggers a sentence on the
> low end of 324 months to 405 months. In Ms. Bennett's case, if I were to
> stay within the guidelines -- and even the government recognizes this -- it

17

would not only be overly punitive, but it would be most certainly a life sentence, and I'm not prepared to do that. So I am prepared to vary, and the question is how much.

J.A. 2118. Next, after entertaining and addressing extensive argument from Bennett's counsel about the § 3553 factors, the district court thoroughly, and on an individualized basis, analyzed those factors, referring to the specific facts of the case and the evidence presented at trial and during sentencing. Finally, the court imposed a sentence that was not only below the guidelines range, but also further below the below-guidelines sentence that the government requested. The sentence was higher than the one proposed by Bennett, but the district court's reasoning in rejecting Bennett's proposal was based not on the guidelines but on the application of the evidence to the § 3553 factors. The totality of the sentencing transcript demonstrates that the district court carried out its statutory duty by listening to the positions advanced by both parties and making an individualized finding pursuant to the § 3553 factors. Therefore, we conclude that remand is not necessary.

As to substantive unreasonableness, Bennett argues that the district court disproportionately relied on the nature of the offense while disregarding the remaining § 3553 factors. We review a sentence for substantive reasonableness by looking at the "totality of the circumstances." *Gall*, 552 U.S. at 51. A sentence that is "within or below a properly calculated Guidelines range is presumptively reasonable." *United States v. Louthian*, 756 F.3d 295, 306 (4th Cir. 2014). On appeal, "[s]uch a presumption can only be rebutted by showing that the sentence is unreasonable when measured against the 18 U.S.C. § 3553(a) factors." *Id.*

18

Certain factors—such as her health, the non-violent nature of the crimes, and her family ties—mitigate in Bennett's favor. However, other factors cut against Bennett, such as the devastating impact of her serious offenses and her failure to accept responsibility for her actions. Here, the district court thoroughly addressed the § 3553 factors, ultimately varying downward from the guidelines range. And unlike the district court, we do consider a within or below guidelines' sentence to be presumptively reasonable. Bennett has not offered any argument or evidence that should lead us to disturb that presumption.

IV.

Accordingly, for the foregoing reasons, we affirm.

*AFFIRMED*